Alynn RONE et al., Plaintiffs, United States of America, Plaintiff-Intervenor,

v.

Barry I. FIREMAN, Superintendent, Hawthornden State Hospital, et al.

Civ. A. No. C75–355A.

United States District Court, N. D. Ohio, E. D.

June 18, 1979.

Franklin J. Hickman, Carolyn L. Carter, Cleveland, Ohio, for plaintiffs.

Leonard Rieser, Karen Christensen, Lucy Thomson, Dept. of Justice Civil Rights Division, Washington, D. C., for plaintiff-intervenor.

Eugene Green, Barry R. Laine and Patricia S. Roberts, Youngstown, Ohio, for defendants Rhodes, Moritz, Davis & Fireman.

John C. McDonald, Emens, Hurd, Kegler & Ritter, Jolynn Barry, Columbus, Ohio, for defendants Rehabilitation Services Commission, Director of the Ohio Dept. of Health, Director of the Ohio Dept. of Public Welfare.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

Three patients at Western Reserve Psychiatric Habilitation Center, formerly Hawthornden State Hospital, initiated this action, pursuant to 42 U.S.C. § 1983, on January 7, 1976, to redress the alleged deprivation under color of law of rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.[1] Plaintiffs named as defendants the superintendent of Western Reserve Psychiatric Habilitation Center, the Governor of the State of Ohio, the director of the Ohio Department of Mental Health and Mental Retardation, the commissioner of the Division of Mental Health, the director of the Ohio Department of Health, the director of the Ohio Department of Public Welfare, and the Ohio Rehabilitation Services Commission.[2] The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(3) and (4).

Essentially, plaintiffs assert that the defendants, acting under color of law, have maintained conditions and practices at Western Reserve Psychiatric Habilitation Center which have deprived them of their right to be free from harm in violation of the Eighth Amendment, and their right to treatment and right to treatment in the least restrictive setting appropriate to their needs both in violation of the Fourteenth Amendment. As pendent state claims, it is further alleged that defendants have violated plaintiffs' statutory rights to humane care and treatment, and to the least restrictive environment consistent with the treatment plan under the law of Ohio.

With regard to the director of the Ohio Department of Health, the director of the Ohio Department of Public Welfare, and the Ohio Rehabilitation Services Commission, plaintiffs allege that they have wholly failed to fulfill their duties under federal and state law. Additionally, it is asserted that the latter two defendants are necessary parties for purposes of relief under Rule 19, Federal Rules of Civil Procedure.

Equitable relief in the form of a permanent injunction is sought. Plaintiffs also request a declaratory judgment and an award of attorneys' fees and the costs incurred in prosecuting this action.

---

1. Although they initially also asserted claims under the First, Fourth, and Ninth Amendments, and the Fourteenth Amendment Equal Protection Clause, plaintiffs have pursued only those claims grounded in the Eighth Amendment and the Fourteenth Amendment Due Process Clause.

2. The Governor, director of the Department of Mental Health and Mental Retardation, commissioner of the Division of Mental Health, and the superintendent of Western Reserve are alleged to be primarily responsible for the violation of plaintiffs' constitutional rights. Thus for convenience and ease of reference, they shall hereinafter be referred to as the defendants. The other named defendants, namely the Rehabilitation Services Commission and director of the Department of Public Welfare, shall be treated separately in distinct sections of this opinion. As more fully discussed herein, a consent judgment against the director of the Department of Health was entered prior to trial.

The defendants have essentially denied the allegations of the complaint.

## PROCEDURAL HISTORY

Shortly after filing the original complaint, plaintiffs, having initiated this action in their own behalf and on behalf of all persons similarly situated, moved the Court on March 2, 1976 to certify the within action as a class action under Rule 23, Federal Rules of Civil Procedure. By Order of March 9, 1976, this Court certified the class consisting of

> all persons who now occupy or who will, during the pendency of this suit, occupy any ward or facility, exclusive of Geriatric Services, as patients at Hawthornden State Hospital

as the class represented by the named plaintiffs.

Pursuant to the consent and stipulation of all parties, a preliminary injunction was entered against the defendants on May 3, 1976. Said Order required the defendants to provide specific relief regarding the number and training and education of staff, patient evaluations, supplies, building improvements and further admissions. The preliminary injunction has subsequently been amended three times by agreement of plaintiffs and defendants due to certain changes of circumstances. The amendments were filed December 2, 1976, June 1, 1978, and March 16, 1979.

On May 25, 1976, the Court granted the United States of America leave to intervene as a party plaintiff in this action. Its complaint in intervention alleging substantially the same violations of plaintiffs' Eighth and Fourteenth Amendment rights was filed that same date.

Thereafter, plaintiffs moved the Court separately to amend the class definition, and for leave to file an amended supplemental complaint. By Order of February 22, 1977, this Court granted the former motion and certified as the class represented by the named plaintiffs the following:

> All persons who have at any time since March 2, 1976, occupied, or who will at any time during the pendency of this action occupy any ward or facility as patients at Western Reserve Psychiatric Habilitation Center (formerly Hawthornden State Hospital).

Thus patients within the geriatric service were included in the class definition. Likewise on February 22, 1977, the latter motion was granted and an amended supplemental complaint filed. This complaint added one named plaintiff as representative of the geriatric service patients; the other allegations are substantially the same as those of the original complaint.

A consent judgment between plaintiffs, plaintiff-intervenor, and the director of the Ohio Department of Health was entered on December 29, 1977. Said judgment was consented to by the director for the purpose of compromising and settling all claims against this defendant. It in effect ordered the health department to follow certain procedures with regard to its programs and services, and the inspection of nursing homes, rest homes, and homes for the aging.

Thereafter, this action proceeded to trial on the issue of liability. The Court duly heard extensive testimony and received numerous exhibits over 31 days in January and February, 1978.

After the trial of this action and submission of the parties' briefs, defendants moved the Court on June 27, 1978 to reopen the record. The purpose of said motion was to inform the Court of defendants' decision to relocate the proposed forensic center on a site other than Western Reserve Psychiatric Habilitation Center. Plaintiffs subsequently joined in said motion and moved the Court to receive into evidence, as plaintiffs' exhibit 217, the deposition of George Gintoli. This deposition was admitted by entry of July 24, 1978 and the motions to re-open the record are hereby granted.

On April 24, 1979, plaintiffs moved the Court for a temporary restraining order enjoining any further construction of a fence or installation of security devices in or around cottage 21 of Western Reserve

Psychiatric Habilitation Center until defendants meet certain conditions. A hearing thereon was duly held on April 25, 26, and 30, 1979. By Order of May 14, 1979, said motion was denied.

Upon consideration of the entire record herein, the Court enters its findings of fact and conclusions of law as required by Rule 52(a), Federal Rules of Civil Procedure.

### HISTORICAL PERSPECTIVE

The origins of official involvement by the State of Ohio in the care and treatment of the mentally ill can be traced to the early nineteenth century. As early as 1815, the legislature of Ohio passed a law providing for the examination of those persons alleged to be insane and for the care of their persons and property. Approximately six years later, the state appropriated $10,000 toward the establishment and support of the first state-funded asylum for the mentally ill, the "Commercial Hospital and Lunatic Asylum for the State of Ohio" in Cincinnati. Although primarily a county institution, the state contributed regularly to its maintenance.

Thereafter in 1938, the first state institution for the care of the insane was authorized to be located in Columbus, Ohio. Admissions to said institution, however, were limited to curable cases only.

The Constitution of the State of Ohio of 1851 provided that "institutions for the benefit of the insane, blind, and deaf and dumb, shall always be fostered and supported by the state." In adopting this provision, the state recognized and accepted responsibility for the care and treatment of the mentally ill in Ohio. As a result, the state hospital system was developed during the latter half of the 19th century. Such was apparently a humanitarian and progressive move at that time, and represented a marked improvement in the treatment and care of the mentally ill.

Thus following legislative action in 1852, facilities were increased at the institution for the insane in Columbus. Thereafter state hospitals were established at Cleveland and Dayton in 1855, at Athens in 1874, at Toledo in 1888, and at Massillon in 1898. Hawthornden was initially operated as a farm for the Cleveland State Hospital from 1922 until 1938 at which time it began receiving patients transferred from other facilities. In 1941, however, Hawthornden State Hospital was established as a separate institution for the mentally ill. Its name was changed to Western Reserve Psychiatric Habilitation Center in 1975. (Dx Y–1).

### WESTERN RESERVE PSYCHIATRIC HABILITATION CENTER

Western Reserve Psychiatric Habilitation Center [hereinafter Western Reserve] is a state owned and operated hospital for the care and treatment of the chronically mentally ill. It provides long-term psychiatric and physical care for residents of four of Ohio's 88 counties, namely Cuyahoga, Geauga, Lake and Lorain. Located approximately 16 miles from both Akron and Cleveland, Western Reserve occupies over 70 of the 600 acres purchased by the State of Ohio in 1923. Since that time 40 buildings have been erected in a campuslike manner with the intended purpose of providing residential, hospital, and administrative services for a population of 1200 patients. The oldest buildings known as cottages and now housing patients were constructed in the 1930's. The most recent addition to the Western Reserve facility is the Geriatric Center which was completed in 1972 at a cost of $6,000,000.

Since its inception, Western Reserve has served, and continues to serve, those individuals with a chronic mental illness. Most of its patients are referred from short-term acute care institutions of the state; the primary ones include Cleveland Psychiatric Institute, Fairhill Mental Health Center, and Fallsview Mental Health Center. Generally, patients are typically transferred from these facilities after a determination by the professional staff that long-term hospitalization and treatment is necessary. Further, a number of Western Reserve's patients have been transferred from long-term state mental institutions; a smaller number represents individuals who come di-

rectly to Western Reserve or are residents of states other than Ohio.

The patient population of Western Reserve is described as chronically mentally ill since the vast majority have experienced a mental disability of long duration. The characteristics of said population were ascertained in a demographic study by the research and evaluation division of the hospital. Said survey involved an inspection of the ward charts of the 775 patients at Western Reserve on September 15, 1976; the results thereof were published in May 1977. (Px 13). Although the survey deals only with the particular patient population at the above specified point in time, it appears to generally reflect the patients at Western Reserve both at the initiation of this suit and during trial. As shown by the survey, the average age of Western Reserve patients is 51 years, and the average patient has had 9.4 years of formalized schooling. The mean age at which the patient population experienced their first psychiatric hospitalization was 31.6 years; however, half of the population was hospitalized for the first time prior to age 27. Although the average length of hospitalization for the resident population in September 1976 was 5.4 years, the median length of hospitalization was only 2.6 years. The survey further indicated that the average number of prior psychiatric hospitalizations was 4.4, and that a typical Western Reserve patient has resided in two or three different psychiatric institutions. The average period of time spent in psychiatric institutions by the patient population was 16.2 years. Finally, the average patient has spent almost 80% of the time since his first institutionalization in psychiatric facilities.

By diagnosis the majority of patients at Western Reserve are classified as experiencing some type of schizophrenic dysfunction. The balance of the patient population has been diagnosed as organic brain syndrome, major affective disorders, and mental retardation.[3] In addition to the diagnostic classification of patients, the population at Western Reserve can be divided into essentially six categories. First, there is the geriatric group which consists of all individuals over 60 years of age. This group at the time of trial numbered approximately 290 patients. The second category of patients at Western Reserve is termed forensic and consists of those individuals who are sociopathic or violent and a danger to themselves or others.[4] There were approximately only 60 forensic or dangerous patients then at Western Reserve. The third and largest category of patients are the chronic mentally ill who have been at Western Reserve between 5 or 15 and 20 years. As described above, these patients have suffered long periods of hospitalization and are frequently diagnosed schizophrenic. The fourth category of patients consists of acutely disturbed individuals who are suffering a severe mental or emotional trauma which requires immediate and intensive intervention. Such individuals numbered approximately less than 100

3. According to the research and evaluation division survey of September 15, 1976, 38 patients or 4.9% of the patient population had a primary psychiatric diagnosis of mental retardation. (Px 13). According to the testimony developed at trial, however, there were then only six patients at Western Reserve with such a diagnosis. Further, although Western Reserve is not oriented toward habilitating such individuals, under unitization phase two provision has been made for the care and habilitation of patients suffering both mental retardation and mental illness.

4. A true forensic patient is a person committed to a state mental hospital by a court as a result of criminal charges. These individuals fit into one of several categories including: persons being evaluated to determine competence to stand trial; persons found to be incompetent to stand trial; and persons adjudicated not guilty of a criminal offense by reason of insanity. At the time of trial, there were only two patients residing on the forensic service at Western Reserve who were actually forensic patients. There were, however, approximately 15 to 18 forensic patients housed on other units of the hospital. The majority of the patients termed forensic and residing on the forensic service had been civilly committed and were thus technically nonforensic. Most of these patients were transferred to that service from other services at Western Reserve because of violent outbreaks, destruction of property, having run away from the hospital, intimidating other patients, or attempting suicide.

patients, and their hospitalization is of a relatively short duration. These patients generally remain at Western Reserve from 30 to 60 or 90 days and then are returned to the community from whence they came. The fifth and final category of patients constituting the population of Western Reserve consists of adolescents. Generally, these are individuals who are transferred to Western Reserve only until a bed is available for them at a state or public facility directed toward the care of individuals under 18 years of age. Thus the adolescent population at Western Reserve is temporary and transitory, and generally patients thereat are not less than 18 years old.

Based on the foregoing, it is readily apparent that, in terms of all the demographic characteristics discussed above, the patient population at Western Reserve is extremely heterogeneous. Such heterogeneity can serve to enhance and stimulate patient social interaction. At the same time, however, it can render program planning and organization problematical.

Finally, a brief outline of the organizational structure of Western Reserve will aid further analysis. On July 28, 1975, the hospital was restructured with the institution of the unit system or unitization. (Dx S-4). Such involved decentralization and the organization of individual living units of patients based upon their functioning level. Pursuant thereto, all patients and staff were assigned to a unit. Each unit is comprised of a quasi-homogenous group of patients in terms of their problems, behavioral assets and treatment needs, and an interdisciplinary treatment team of staff. The primary function of a unit is the direct delivery of service to the patients who reside therein. These patient living units are further organized for purposes of administration and programs into service areas. Each area thus consists of a number of units whose patients generally require similar services and programs. The service areas are: incoming service; personal rehabilitation service; social re-education service; outward bound service; geriatric service; the infirmary; forensic service; and the medical-surgical service. Additionally, there are two nonresidential service areas, after care service and ancillary service; the former provides community placement and monitoring services, while the latter supervises medical support services.

At the time of trial, Western Reserve was preparing for the implementation of unitization phase two. Such involves a further reorganization of the hospital structure into residential and nonresidential projects. The goal of unitization phase two is the provision of meaningful programming which is community oriented or community based. The physical settings, social situations, and expectations are to share as closely as possible the attitudes and values of life outside the hospital. It is to provide a new vocational service, additional evaluation and counseling services, and expanded community programs.

### FACTUAL ANALYSIS

With the above brief description of Western Reserve clearly in view, the Court shall now proceed to address the main areas of concern to the plaintiffs. Essentially, the Court after reviewing all the testimony and evidence has identified six critical or key issues: living conditions; staff; medical care; administration of drugs; therapeutic treatment; and alternate settings. In so doing, the Court notes that each area has not remained static, but is characterized by development and change. Thus in discussing these issues the Court shall refer to three relevant time frames: pre-April 1975; April 1975 to May 1976; and May 1976 to present. These three periods have been determined to be significant by reference to two events. First, in April 1975 defendants Moritz and Fireman assumed the positions of director of the Ohio Department of Mental Health and Mental Retardation [hereinafter the department] and superintendent of Western Reserve, respectively. Second, on May 3, 1976, the preliminary injunction herein was entered pursuant to the stipulation and consent of the parties. As will be shown more fully below, said events brought about substantial changes at Western Reserve.

## LIVING CONDITIONS

In 1971 the Citizens Task Force on Mental Health and Retardation was commissioned by the then Governor of Ohio to review conditions in the state institutions. Their findings were highly critical of the neglect and abuse of the mentally ill committed to Ohio's mental institutions and hospitals. In their trial brief, defendants admit that Western Reserve was among the institutions cited by this task force. They further acknowledge that patients at Western Reserve were housed in overcrowded cottages, and were subject to supervision and abuse by an undermanned and indifferent staff. Such dehumanizing conditions existed in 1975 when the state defendants assumed their respective offices.

Indeed prior to April 1975 and continuing thereafter into 1976, the living conditions at Western Reserve were essentially substandard and dangerous to both the mental and physical health of the patients. Housekeeping and maintenance were extremely poor; many of the physical structures presented fire and safety hazards, while patient areas were generally filthy and malodorous. Moreover, the cottages or patient living quarters were so crowded that privacy and quiet were nonexistent even during the night.

The eradication of such antitherapeutic, dangerous, and inhuman conditions was apparently one of the priorities of the defendants after April 1975. Yet despite such priority, these conditions continued to exist well into 1976. It appears that such was in great part a function of inadequate numbers of staff. As discussed more fully below, in 1975 the staff shortage at Western Reserve became exacerbated due to a budgetary crises which prompted a considerable reduction in the workforce. Prior to May 1976, staff levels at Western Reserve were insufficient to provide custodial care; there simply were not enough staff to protect the lives and safety of the patients.

With the entry of the preliminary injunction, defendants were required to hire a substantial number of new staff members. Included therein was the requirement that 28 housekeepers be added to the maintenance staff. Further, defendants were required to formulate a plan for building improvements. Among the improvements to be included in such plan were the following: installation of safety devices; remedying of hazardous conditions; repair, replacement and provision of sanitary conditions; division of units into wards housing no more than 30 patients; provision for the privacy of patients; and alterations to the interiors of buildings in order to provide adequate and therapeutic patient activity areas.

As a result of defendants' compliance with such requirements, the physical conditions of Western Reserve have greatly improved. Thus Western Reserve is no longer an inhuman and dangerous place. It is clean and safe. Generally, the living conditions and overall environment at Western Reserve are adequate for the provision of care and treatment to mentally ill patients, with one exception.

The one exception is cottage 21 which houses patients living in units of the incoming and forensic services. Initially, the physical condition of this facility presents numerous hazards: security is poor; there are problems with ventilation; the doors leading to patient rooms do not meet fire safety code requirements; and there are cracks in the building foundation which may become serious in the future due to a fault underneath the structure. Further, cottage 21 lacks treatment space and a therapeutic environment. Indeed it appears to be a dangerous place for patients.

At trial considerable testimony was presented by defendants regarding plans for a new forensic facility on the grounds of Western Reserve. Such facility was actually one of three regional forensic psychiatric centers to be developed as a replacement for Lima State Hospital. It assertedly would have corrected the numerous shortcomings in the treatment and living conditions existing in the forensic service. Apparently as a result of significant public opposition, however, the state has agreed to locate the proposed forensic facility for northeastern Ohio on a site other than

Western Reserve.[5] Yet defendants have not submitted or developed alternate plans to remedy the acknowledged deficient living and treatment conditions of cottage 21. Indeed it appears that no significant improvements or renovations of this facility have been made to date.

Therefore, the Court finds that cottage 21 has been, and continues to be, a hazardous, unsafe and antitherapeutic facility for patients. The living conditions and environment are clearly inadequate for the provision of care and treatment to mentally ill persons.

The problem of overcrowding in the cottages was also addressed by the preliminary injunction. The injunction required that no more than 30 patients be housed in a single ward. Further, following the renovations undertaken in accord therewith, there were to be no units housing patients with more than two beds per room. Prior to this, however, the defendants attempted to relieve the overcrowded condition at Western Reserve by decreasing the patient population. Such is reflected in the admission and discharge figures for Western Reserve. In the case of admissions, readmissions or transfers into Western Reserve, there has been a substantial and continuous decrease since fiscal year 1975.[6] While in fiscal year 1974 there were 1068 said admissions or transfers, in fiscal 1975 there were only 769, in fiscal year 1976 there were only 447, and in fiscal year 1977 there were a mere 393.

Further, for the three year period commencing 1974 and ending 1976, 2059 patients were either discharged from resident status or transferred from resident status to extramural care. Specifically, in 1974 the patient population at Western Reserve experienced the discharge or transfer of 682 patients. During 1975, 780 patients were removed from resident status, and in 1976, 596 patients were either discharged or transferred from said status.

The result of the defendants' actions in the area of admissions and discharges was of course a decline in the total patient population at Western Reserve. Whereas Western Reserve served 957 resident patients in January 1975, it accommodated only 709 said patients in November 1977. (Dx H–6). At the time of trial, Western Reserve's population fluctuated between 725 and 750 patients compared to a population often numbering over 1000 prior to 1975. Thus it is readily apparent that due to the affirmative policies and practices of the defendants, the overcrowded condition at Western Reserve in terms of patient population has been relieved and remedied.

Prior to April 1975, another significant problem at Western Reserve consisted of the physical and sexual abuse of patients by staff members. The alarming scope and number of such incidents led the defendants thereafter to cause an investigation by the Ohio State Highway Patrol. Said investigation confirmed the serious and widespread nature of such instances, and ultimately led to the indictment of a number of staff members for a variety of criminal offenses. At the same time the defendants instituted discharge or removal proceedings against each employee who was found to have engaged in any type of patient abuse or exploitation; such actions resulted in the removal of approximately 100 staff members.

Although staff abuse of patients was formerly quite prevalent at Western Reserve, the defendants have significantly minimized the incidents thereof since assuming their respective offices. While the existence of even one such incident is undesirable, it must be recognized that staff abuse of patients in mental institutions is always a problem by virtue of the nature of the patients and the institution. The Court finds, however, that as a result of the defendants' policies and practices incidents of patient abuse by staff are atypical and do not constitute a significant problem at Western Reserve.

5. The Court was informed of this decision in defendants' Motion to Reopen Record filed June 27, 1978.

6. The relevant fiscal year herein begins on July 1, and continues until June 30.

Specifically, two policies in particular appear to have contributed to the minimization of patient abuse at Western Reserve. First, defendant Moritz promulgated on October 23, 1975 Ohio Department of Mental Health and Mental Retardation Executive Order No. G-2 dealing with client abuse and neglect. Said order, effective October 31, 1975, made it the responsibility of the superintendent of each state facility for the mentally ill to appoint a committee of institutional staff to investigate alleged instances of client abuse and neglect, and to inquire and make recommendations as to the ability of the employee involved to function in a direct care position. The superintendent was further charged with responsibility for implementing appropriate disciplinary action including written reprimand, suspension, and removal where allegations of abuse were substantiated.

In compliance with said order, Western Reserve has established a patient abuse committee which has investigated reported incidents of physical and sexual abuse of patients by staff, and made recommendations to the superintendent as to the appropriate action to be taken in cases thereof. Employees at Western Reserve have been reprimanded, suspended, and removed as a result of the committee's investigations and recommendations to the superintendent. The order and its implementation appear to function effectively as a deterrent to patient abuse and a method of disciplining offenders.

Second, on June 30, 1976, defendant Moritz promulgated Executive Order No. G-26 with regard to the advocacy, promotion and protection of clients' rights. This order which became effective August 26, 1976 required each institution for the mentally ill to designate a client rights advocate. Among the responsibilities assigned to such individual was the duty to assist patients especially in the area of abuse and neglect. Western Reserve implemented said order promptly by appointing a chief patient advocate for the institution and designating staff within each unit as additional patient advocates. The latter are responsible for paying particular attention to the rights of patients and notifying appropriate persons, including the chief advocate, the hospital administration or the advocate division within the department, of any violation of those rights. Thus since August 1976, Western Reserve has developed perhaps the most extensive patient advocacy system of any hospital in the state.

A final area of concern within the ambit of the living conditions at Western Reserve is the use of restraints or seclusion of patients. The current policy of the department with regard to restraint of patients was promulgated in Executive Order No. G-3, effective June 28, 1973. The purpose of said order was to establish a policy which would provide for the use of restraints only as an emergency measure and to prohibit their use as punishment. The policy as outlined in the order is essentially in compliance with the standards accepted today by most public mental institutions. (Px 54). Although there are instances of abuse of such policy at Western Reserve, the record herein does not establish an overly excessive and improper use of restraints and seclusion.

*STAFF*

One of the most important issues in this litigation involves the staff of Western Reserve. Essentially it is a question of the adequacy of the staff in terms of both number, and education and training. An adequate staff is, of course, necessary to the provision of care and treatment.

As previously indicated, the department experienced a budgetary crisis in early February 1975. In order to stay within the bounds of its budget allocation, the department initiated a selective hiring freeze. As a result Western Reserve was not allowed to replace staff, and incurred the transfer of approximately 30 personnel to the Division of Mental Retardation. Such reduction in staff necessitated the closing of some patient living units, and the concomitant reassignment of staff. More importantly, however, the loss of staff made adequate care and treatment of the patient population virtually impossible. Thus in 1975, the

need for additional staff was the most crucial need of Western Reserve. Counsel for the parties herein have stipulated that the number of staff per patient ratio prior to May 1976 was not satisfactory.

The defendants were keenly aware of the staff shortage problem at Western Reserve. Such awareness and concern prompted the agreement to hire a substantial number of additional staff which was formalized in the preliminary injunction entered May 3, 1976. Specifically, defendants agreed to hire 253.5 additional staff members at Western Reserve as set forth therein.[7] Therefore, when the preliminary injunction was filed herein there were 804.5 staff members at Western Reserve. The staffing required by the preliminary injunction numbered 1016.1 persons. As of November 5, 1977, however, there were 1023.0 staff employed at Western Reserve. Thus the defendants have gone beyond what was required by their agreement and the injunction in order to provide care and treatment for the patient population.

These increased staff levels naturally mean that there has been a marked improvement in the staff-patient ratio at Western Reserve. Whereas in January 1976 there were .92 staff per patient at Western Reserve, as of November 5, 1977 the number of staff per patient was 1.43. (Dx P). Such represents an important increase in the overall availability of staff to provide care and treatment for the patient population.

Further by comparison to five other state facilities which also provide extended care, Western Reserve ranks quite favorably. As of December 17, 1977, Lima State Hospital had the best staff-patient ratio with 2.06 staff per patient. After Lima, Dayton Mental Health Center and Western Reserve ranked next with staff-patient ratios of 1.46 and 1.42 respectively. The other three state institutions had the following number of staff for each patient: Toledo Mental Health Center, 1.37; Cambridge Mental Health and Mental Retardation Center, 1.07; and Massilon State Hospital, .91. (Dx G–6). As is readily apparent, Lima State Hospital generally had considerably more staff for its patient population than each of the five other institutions. The population at Lima, however, is considerably different from that of the other long-term care facilities. Lima is a maximum security institution housing primarily violent and dangerous individuals who therefore require more supervision. In view thereof, the number of staff per patient at Western Reserve is, by comparison, not significantly disproportionate to that at Lima. Indeed Western Reserve appears to have one of the best staff-patient ratios for a state extended care hospital with a comparable population.

Additionally, Western Reserve's staff-patient ratio as of November 30, 1977 was better than that of each of the Division of Mental Health's nine extended care hospitals. While the average staff per person ratio of such facilities was 1.18, Western Reserve had 1.43 staff per patient at that time. Also, while the average ratio showed an improvement from January 1975 of 47.61%, Western Reserve's staff-patient ratio improved 62.06% from what it was in January 1975, namely .885. (Dx H–6).

There is no generally accepted rule of thumb for the ratio of staff to patients in an institution for the chronically mentally ill. Such hospitals nationally apparently have slightly more than one staff person per patient. At facilities for the acutely ill, however, the ratio is closer to two staff per patient. Thus, it appears that, as of November 1977, Western Reserve was a little above the existing standard or norm in facilities for the chronically mentally ill.

Further, the staff-patient ratio does reflect upon the quality of the service, care and treatment rendered at an institution for the mentally ill. Although it is only one factor and there is not a directly propor-

---

7. As indicated above, pursuant to stipulations between plaintiffs and defendants, two orders and one agreement amending the preliminary injunction have been filed. They have, however, only modified staff categories; there has not been a change in the total number of staff to be hired for Western Reserve.

tionate relationship between said ratio and such quality, it is highly significant.

Of similar importance in determining the adequacy of care and treatment at a hospital for the mentally ill is the training and experience of the staff. It is apparent that, prior to the agreement formalized in the preliminary injunction herein, the personnel at Western Reserve were generally not qualified in terms of formal education or training and experience to provide effective care and treatment to the patient population. Since the injunction and as a result thereof, however, the hiring and recruiting policies and practices of Western Reserve show a determination to hire the best available qualified persons.

In order to render effective care .and treatment, a hospital for the mentally ill must not only hire qualified individuals, but must assure the continuation of their training and education during their employment. Providing and assisting in such is a responsibility of the hospital. Prior to May 1976, Western Reserve had an extremely small number of training programs for its staff. A meaningful orientation program for new staff members was essentially nonexistent. The programs that were available consisted of one for psychiatric aides and one dealing with the administration of psychotropic drugs. Generally the training and education that was available to personnel at Western Reserve was sorely inadequate.

The preliminary injunction required the commencement of a program of initial and continuing education and training for all staff members at Western Reserve. This requirement could be implemented because enough additional staff were likewise required to be hired under the terms of the injunction; the staff shortage at Western Reserve prior thereto precluded the establishment of any such meaningful program. As a result an education program and service has been created at Western Reserve. Although it still appears to be limited in scope, there has been an improvement in the orientation, education and training available to staff. Yet the educational program and service was not adequate at the time of trial to provide the initial and continuing training and education of personnel essential to rendering effective care and treatment.

## MEDICAL CARE

In addition to addressing the mental health of its patients, Western Reserve also attends to their physical health and well-being. Medical care and treatment is provided at Western Reserve by three different means.

Initially, such care is given directly to patients on each unit by the particular physician assigned thereto. Those patients requiring more extensive care are transferred to the medical-surgical service which is essentially a hospital within the hospital. Said service has about 32 beds for the provision of inpatient care by a staff comprised mostly of nurses and hospital aides. Finally, those patients requiring continuous medical care and attention are treated at the infirmary. Generally, these are geriatric patients with chronic physical disabilities such as diabetes, epilepsy, Huntington's chorea, and serious heart disorders. At the time of trial for example, there were 50 patients housed in the infirmary and half of those were nonambulatory.

Although Western Reserve provides a wide range of medical care, it does not have the resources and facilities to offer all the services provided by a general hospital. Thus those patients needing specialized medical care or surgery are transferred to a general hospital in Akron.

With regard to the quality of medical care at Western Reserve, plaintiff relies primarily upon the survey by Dr. Peter H. Slugg. The major portion thereof was directed toward a review of medical care as of December 29, 1976. (Px 22). In making this study Dr. Slugg reviewed the autopsy protocols and corresponding patient charts of nine patients who had died between January 1975 and August 1976. He also examined on December 17 and 29, 1976 the charts of 18 patients then at Western Reserve. In so doing, Dr. Slugg acknowledged that such retrospective reviews do have inherent problems and limitations. Although

relevant information can be obtained thereby and such review is a professionally accepted method of assessing the adequacy of medical care, it is not absolutely accurate or a substitute for actual examination of a patient.[8]

It must be further recognized that Dr. Slugg's survey involved, as of December 29, 1976, the evaluation of a total of 27 patient charts. By contrast, the patient population at Western Reserve numbered 756 on October 5, 1976. (Dx O). Thus it appears that only approximately 2% of the patients at Western Reserve were actually studied. Such percentage would probably be even smaller if all of the patients who were treated and cared for at Western Reserve from January 1975 until December 29, 1976 were taken into consideration.

Based on such chart reviews, interviews with six physicians at Western Reserve, and a tour of the medical-surgical service, Dr. Slugg concluded:

> In summary, the level of medical care offered and available to residents at WRPRC is below generally recognized standards, in some areas inappropriate and in other areas non-existent.

Plaintiffs' exhibit 22 at V–2. As stated above, however, said conclusion is premised upon an extremely limited analysis. Moreover, Dr. Slugg himself admitted that other physicians may disagree with some of his report, and that honest differences do exist among physicians in the care of patients. Further, with the benefit of hindsight, for example after an autopsy, he has found a diagnosis to be incorrect which previously may have seemed indicated by the symptomology.

In view of the foregoing, the Court finds that Dr. Slugg's conclusions as to the adequacy of medical care at Western Reserve

prior to December 29, 1976 are predicated upon a limited and insufficient foundation. Thus little weight shall be accorded to them. Further, they do not reflect the quality of medical care at Western Reserve subsequent to that time.

Of more significance than Dr. Slugg's conclusions are some of his findings with regard to the medical care and treatment provided patients at Western Reserve. Specifically important are those findings of particular problems in such care which have been otherwise supported and demonstrated in the record herein. Indeed both prior to and after the entry of the preliminary injunction on May 3, 1976, there were deficiencies in the medical care at Western Reserve.

Before May 3, 1976, many problems arising in the delivery of medical care to Western Reserve patients were attributable to the staff. Several unlicensed physicians were employed by the hospital in direct patient care and permitted to conduct physical examinations of patients with little or no supervision. Some physicians also had difficulty with the English language, and others lacked training, experience, and orientation in areas of particular importance to institutionalized chronically ill patients. Overall there was a lack of leadership, poor organization, administration and supervision of the medical staff. Continuing medical education was nonexistent and not encouraged. Valuable consultants in specialized fields were not available. Staff other than medical personnel lacked training in cardiopulmonary resuscitation.

Other problems in the medical care at Western Reserve included antiquated and nonoperational oxygen and resuscitation equipment. Further there was a failure to give each patient an annual and complete

8. A question arises herein whether Dr. Slugg merely reviewed the charts of the patients on the particular units, or also reviewed the entire medical records of the patients in the medical records room. To the extent that he merely conducted a chart review, many of his conclusions may be based on an incomplete picture of the patients' medical history and problems. Further, many of his questions regarding medi-

cal care may be attributable to such incomplete data. A review of the patients' medical records, however, would have supplied him with all the recorded data on the patients' medical history and problems. To that extent, a review thereof would have been more complete and a better foundation upon which to render an opinion and conclusions regarding the adequacy of medical care.

physical examination. Routine medical tests were either not conducted or not performed with any degree of regularity.

The preliminary injunction addressed a number of these problems. Initially, it required the hiring of 5.5 full-time equivalent physicians licensed to practice medicine in Ohio. Said physicians were to be qualified to provide services appropriate to the needs of Western Reserve patients including gynecology and other specialized services. Further, commencing May 24, 1976, each patient was to be given a thorough medical and physical examination. Such examination was to include, among others, the following: an electrocardiogram (EKG) for patients over 40 years of age, or if such was medically indicated; a PAP test for female patients; all tests routinely performed in a complete physical examination or necessary to monitor side effects of drugs, including blood tests, liver function test, and urinalysis; procedures adequate to diagnose skin diseases; procedures adequate to diagnose side effects of psychotherapeutic medication; and an examination of eyes, vision and hearing.

In order to ascertain whether Western Reserve was in compliance with these requirements, the research and evaluation division conducted a survey of service documentation. (Px 13). The method employed therein involved the inspection of the ward charts for the 775 patients residing at Western Reserve on September 15, 1976. The results showed that 771 patients had completed physical examination forms in their charts, and that 95.9% of the charts had forms which were less than one year old. Only 32.2% of the completed physical examination forms, however, addressed each of the 21 different areas to be evaluated. Further, there appears to have been no systematic and consistent evaluation of visual acuity, hearing and skin by the physicians.

With regard to electrocardiograms (EKG), 38.1% of the patients over 40 years of age had one within the past year. Less than 13% of the female patients at Western Reserve had any record of a PAP test, and a mere 6.5% of the females had one within the year. Between 92% and 95% of the patient population, however, had the three routine blood serum tests within the past year. Slightly under 75% of the patient population had a chest x-ray within the previous year, and 89.5% had a urinalysis within such time frame. A mere 2.7% had no PPD Tuberculin test record in their charts, but 10.6% were in need of such testing. Although only 6.4% of the patients had an electroencephalogram (EEG) report in their charts, there was no way to determine whether such were medically indicated. Finally, only nine patients had no record of a dental visit; 97.4% had a dental visit within the last year. (Px 13).

Thus the survey reveals that, as of September 15, 1976, Western Reserve was not in substantial compliance with most of the physical examination requirements of the preliminary injunction. Said survey, however, was conducted a little less than four months after the complete patient evaluations were commenced. Therefore, a follow-up study was made in May 1977 utilizing the same method as the initial survey. (Px 14). The only significant improvement, however, was the increase in the administration of the PAP test and EKG. As of May 1977, 86.2% of all female patients at Western Reserve had a PAP test within the last year; such represents an increase of 79.7% over the September 1976 figure. Similarly, 70.3% of the patients over 40 years of age had an EKG within the past year as compared with only 37.5% in September 1976 for a 32.8% increase therein.

Shortly thereafter, further significant affirmative action was taken to eliminate the problems in the delivery of medical care at Western Reserve and to assure the provision of acceptable medical treatment. Consultants were obtained and available on a regular basis in neurology, dermatology, gynecology, and urology. Two internists joined the medical staff in the summer of 1977; Dr. Kieve Shapiro, hired as head of the medical-surgical service, has had specialized training and experience in emergency medicine. Further, unlicensed physi-

cians are no longer being hired by Western Reserve and extensive efforts have been made to hire qualified physicians. A policy has been adopted whereby physician requests for the transfer of patients to the medical-surgical service are honored and not questioned. Similarly, guidelines have been developed for the transfer of Western Reserve patients to other facilities. In that regard, every member of the five person hospital team responsible for transporting a patient to another hospital has training in advance first aid and cardiopulmonary resuscitation. Additionally prior to any transfer, Dr. Shapiro confers with the receiving physician at the Akron general hospital before the patient arrives. Further, the department has adopted a policy regarding continuing medical education for physicians, and such is encouraged and supported.

As indicated above, one of the serious problems with the medical care delivery system at Western Reserve was the lack of leadership, and poor organization, administration and supervision of the medical staff. It appears, however, that with the appointment of Dr. Magdi Rizk as Medical Coordinator on October 11, 1977, a significant step was taken toward the elimination of such problem. Within the short period between his appointment and the trial herein, Dr. Rizk undertook a considerable number of projects and acted to assure quality medical care for all patients at Western Reserve. He contracted with three board certified psychiatrists to serve as consultants to Western Reserve. Similarly he obtained the services of a board certified psychologist with special education in psychopharmacology on a consultant basis. Said individual lectures once a week at Western Reserve and reviews difficult cases wherein a patient does not respond to treatment. Also, Dr. Rizk recruited three physicians to join the full-time staff at Western Reserve; one is a medical doctor with an extensive background in mental health and two are board eligible psychiatrists.

Additionally, Dr. Rizk conducts medical staff meetings every two weeks and has made attendance thereat mandatory except in case of an emergency. These meetings are designed to help the physicians better meet their responsibilities, and often include other staff members in an effort to promote staff understanding and cooperation. Dr. Rizk has also written a comprehensive orientation schedule for new physicians which will last approximately two full days or sixteen hours. Also he encourages and supports continuing education for physicians, and their attendance at seminars, conferences and special courses. He also initiated a self-medication program for patients able to take their own medication; at the time of trial a small number of patients were on self-medication.

Based on the foregoing and all of the evidence in the record herein, the Court finds that the medical care provided at Western Reserve prior to May 3, 1976 was generally inadequate. Since that time, efforts have been made to eliminate deficiencies in the medical care delivery system, and improve the overall level of medical care and treatment provided to Western Reserve patients. Although there are still instances of inadequate or inappropriate care, plaintiffs have not shown that such is the prevailing practice or general rule. Thus the Court concludes that the present level of medical care and treatment available at Western Reserve is consistent with minimally acceptable community standards.

## ADMINISTRATION OF DRUGS

The fourth major issue raised herein concerns the manner in which psychotropic drugs are administered to patients at Western Reserve. Essentially psychotropic drugs are a class or group of drugs which primarily affect the human mind or human behavior. They are chemicals which affect the brain and nervous system, and alter emotions, feelings and consciousness. The basic categories of psychotropic drugs include the following: antipsychotic; antidepressant; antianxiety; antimanic; stimulants; and sedative hypnotic depressants. The study of these drugs is termed psychopharmacology.

Psychotropic drugs first came into fairly widespread use in psychiatry around the middle 1950's. They are generally used in the treatment of patients presenting a certain behavioral syndrome. They are prescribed in order to reduce such syndrome, and render the patient more amenable to other forms of treatment or intervention. Today psychotropic drugs are probably the most common form of treatment for mental and emotional disturbances.

At Western Reserve psychotropic drugs form an important part of the treatment given patients. The five major categories of such drugs being used are: antipsychotic or major tranquilizers; antianxiety or minor tranquilizers; antidepressants; anticonvulsants; and lithium salts. (Dx C–2). A review and analysis of drug use at Western Reserve was made in December 1976 by Dr. Alberto DiMascio, director of psychopharmacology services for the Department of Mental Health of the Commonwealth of Massachusetts. (Px 162). Dr. DiMascio first collected information from the physicians at Western Reserve regarding the major physical disabilities, diagnosis, and medications of 699 patients. Then he and a colleague examined all the data provided for each of 356 randomly selected patients. They thus analyzed the medication practices at Western Reserve as of December 1, 1976.

The results of the survey revealed that, as of December 1, 1976, 85% of the 356 patients reviewed were receiving at least one psychotropic drug. Of those patients, the vast majority or 87% were on an antipsychotic medication. Polypharmacy or the use of two or more psychotropic drugs was found in 18% of the patients studied. The average number of both psychotropic and medical drugs prescribed to Western Reserve patients was 2.5. In 22% of the patients surveyed who were taking antipsychotic drugs, antiparkinson medications were also prescribed. It was further found that weekend-free medication schedules were almost nonexistent, whereas 35 of the patients examined might have been placed on such a regimen.

Additionally, in studying the medications prescribed with regard to whether such were consistent with appropriate prescribing practices, Dr. DiMascio and his associate found a substantial number of practices that they believed should be questioned or altered. Among the major problems cited was the use of medications which did not appear appropriate in light of the given diagnosis or symptomatology. Indeed in 17% of the cases surveyed, Dr. DiMascio questioned whether the medication given was indicated by the patient's symptoms or diagnosis. The second major problem was found to be the use of the same medication for a prolonged time period without a remission of the patient's symptoms. Based upon the then exhibited symptomatology, there were 78 instances, or 12% of the total practices questioned, which involved patients who had been taking the same neuroleptic drug for over six months, and yet still presented considerable symptomatology. Dr. DiMascio did not, however, study whether the physicians had tried alternate medications without success, and thus returned to the ones which still showed some symptoms because such did relieve the condition to a degree.

Another problem area was found to be the use of prn or "pro re nata" (according as the circumstances may require) medications for patients receiving psychotropic drugs. It was also noted that there was a high use of concentrate forms of neuroleptic drugs which are more expensive than capsule or tablet medication. Finally, the use of t. i. d. (3 times per day) and q. i. d. (4 times per day) dosage schedules for 14% of the patients receiving psychotropic medications was questioned. Generally, such medications can be given much less frequently; nevertheless, said frequent dose practice is probably consistent with minimally accepted professional standards.

Based upon the results of his survey, Dr. DiMascio concluded that there was room for improvement in the prescribing practices of the physicians at Western Reserve. Indeed it appears that, as of December 1, 1976, there were many medication practices which were not based upon scientific or

clinical evidence, and did not meet standards acceptable to recognized professionals in the area. Thus Dr. DiMascio recommended that an extensive education program be initiated for all staff and especially physicians on the use of psychopharmacological agents, and that a monitoring program be established to review prescribing patterns and medication usage.

Recognizing that problems existed in the use of psychotropic drugs, Western Reserve implemented a number of programs and policies to correct them. In December 1976, the education service prepared a guide book on psychotropic medications for all patients and their families. It was designed to provide them with basic information about such drugs in order that patients might be better informed about and become more actively involved in their treatment program. Further as of January 1, 1977, only licensed physicians, registered nurses, and licensed practical nurses with specialized training in pharmacology were authorized to dispense psychotropic drugs.

Moreover, the frequent use of psychotropic medication and the concern over the side effects thereof led Western Reserve to institute a drug monitoring system apparently in early 1977. Said system was an outgrowth of the development of drug profiles for each patient begun by the director of Western Reserve's pharmacy shortly after assuming his position on October 4, 1976. The monitoring system involves the recording of all physicians' orders for medication on the patient's drug profile card. Such profile is then reviewed by the director of the pharmacy or another pharmacist for any potential adverse drug interaction or an apparent inconsistency between the prescription and the patient's diagnosis. If a question arises as to the medication prescribed, the pharmacist communicates such in writing to the medical coordinator who, after reviewing the matter, in turn forwards his written comments to the treating physician for his review and response. When the prescribing physician's response is inappropriate or his judgment is unsubstantiated, the medication is adjusted accordingly.

Thus the drug monitoring system at Western Reserve involves both a clinical pharmacist knowledgeable in psychopharmacology and the medical coordinator. It is a fairly sophisticated system designed to detect and prevent possible harmful side effects and drug interactions. It appears that Western Reserve is in the vanguard in developing a drug monitoring system; the majority of long-term mental hospitals currently do not have such a practice.

During the summer of 1977 defendant Fireman, who has his doctorate in psychopharmacology, gave a course in psychotropic medications; attendance thereat was mandatory for all physicians. Similarly, training or education programs in the administration of psychotropic medications have been mandated for nursing personnel. Finally, as discussed previously with regard to medical care, the preliminary injunction herein required that each patient be given a complete medical examination. Specifically included within the scope of said examination were all tests necessary to monitor for side effects of drugs, and procedures adequate to diagnose side effects of psychotherapeutic drugs. Further, written procedures for monitoring chemotherapeutic regimens were to be developed by April 26, 1976.

As a result thereof a chemotherapeutic monitoring system was developed and became fully operational on October 4, 1976. Essentially the system utilizes laboratory tests to monitor the use of certain chemotherapeutic agents. It is specifically directed toward all newly admitted patients, patients on psychotropic drugs, lithium and tridione, and epileptic patients on anticonvulsant therapy.

An interim review of the overall effectiveness of the chemotherapeutic monitoring system was made by Western Reserve's research and evaluation division on January 25, 1977, a little over four months after its implementation. (Px 26). The results showed that a substantial number of admissions tests were incomplete, and that, according to specific test documentation, pa-

tients had not received required laboratory tests. Further, patients on lithium were ineffectively monitored, and no controls were provided for monitoring those on tridione. (Px 26). Thus it appears that the system was not operating effectively in January 1977.

By mid-April 1977, however, significant positive change had occurred in Western Reserve's efforts to monitor those patients being given certain medications. Such was revealed in a follow-up study of the system conducted at that time. (Px 27). The study involved a comprehensive examination of the laboratory documentation of tests provided all patients under the system from January 24, 1977 to March 31, 1977. It was found that 87% of the newly admitted patients received all required laboratory tests; of the 13% that did not, several refused such services and others did not require specific ones. With regard to those patients on psychotropic drugs, approximately 92% received all laboratory tests as scheduled. The one patient identified as receiving anticonvulsive medication had all required tests. Similarly, the 12 patients on lithium medication were being monitored effectively. Finally, although no patient was then on a tridione regimen, controls had been set up to monitor such cases. The review did indicate, however, that there was a continuing need to make sure that all patients on the specified medications were identified and under the monitoring system. Nonetheless, commendable strides have been made in providing an effective chemotherapeutic monitoring system.

Therefore, the Court concludes that prior to 1977 the drug practices at Western Reserve were generally not in accord with recognized professional standards. Although there were instances of practices that were consistent with those in other hospitals for the mentally ill or with minimally accepted community standards, there were a considerable number of questionable or inappropriate prescribing practices. In late 1976 and early 1977, however, Western Reserve proceeded to initiate programs and policies which have served to monitor medication usage and to effectively curb any potential undesirable or harmful consequences of psychotropic drug treatment.

## THERAPEUTIC TREATMENT

An essential function of Western Reserve is the provision of nonmedical therapeutic treatment. Such treatment includes psychiatric, psychological, vocational, and educational activities and programs. It is plaintiffs' contention herein that Western Reserve has in the past failed, and continues to fail, to provide patients with therapeutic treatment.

Prior to the entry of the preliminary injunction on May 3, 1976, there were few written or planned therapeutic programs for the patients at Western Reserve. Similarly there was little programming or constructive activity actually occurring. Patients were for the most part idle; they spent their days milling about, sitting passively, watching television or even lying on the floor. Patient-staff interaction was virtually nonexistent; staff tended to stay in their duty stations on the unit when not engaged in any particular task.

Based on the record herein, it is clear, and the Court so finds, that there were few meaningful therapeutic programs and scheduled activities for patients at Western Reserve before May 3, 1976. Such lack of treatment was due in great part to an insufficient number of staff and inadequately trained staff. The preliminary injunction agreed to by the parties sought to relieve these deficiencies. It required the defendants to hire, among others, the following additional staff members: 10 social workers; 17 social service aides; 17 activity therapists; 8 psychologists; 5 social program specialists; 3 vocational counselors; 8 patient evaluators; and 6 staff trainers.

Additionally, the provisions of the preliminary injunction regarding patient evaluations and building improvements contained requirements directed toward therapeutic treatment. Specifically, each patient was to be evaluated as to his self-care and social skills, and his general functional level. Such patient evaluation was to include: a detailed assessment of the skills the patient

can acquire through therapy; a statement of short- and long-term goals to be achieved through therapy; a thorough assessment of the most appropriate therapy for the patient; and the manner in which said therapy should be administered in order that the defined goals be achieved. Further, a written determination was to be made as to whether the patient could be placed in another less restrictive setting appropriate to his needs. If it was determined that the patient could not then be so placed, a written assessment was to be made of the conditions precedent to placing the patient in a less restrictive environment.

With regard to improvements in the physical plant, the plan therefor was to provide alterations in the building interiors which would be conducive to therapeutic activities. Such alterations were to eliminate isolated nursing stations so as to encourage patient-staff interaction, and to provide rooms and space adequate to accommodate a variety of patient activities.

Subsequently, the research and evaluation division of Western Reserve attempted to assess whether the requirements of the preliminary injunction regarding treatment plans and goals were being met. This was done as part of their survey of certain medical and psychiatric services, and the patient population. (Px 13). As discussed previously, this survey involved the inspection of the ward charts of the 775 patients at Western Reserve on September 15, 1976. It was found that although all but one of the 775 patients had an individual treatment plan, such did not meet the requirements of either the preliminary injunction or Ohio Department of Mental Health and Mental Retardation Executive Order No. MH–5 which established departmental policies and guidelines governing individualized treatment plans.[9] In an overwhelming number of cases, almost all of the six statements required by the preliminary injunction, with the exception of short-term and long-term goals, were not addressed. Generally, there was no differentiation between short- and long-term treatment goals. Such goals were not behaviorally specific, but rather consisted of global statements which often merely reiterated the purpose of the institution. It was further found that treatment teams generally lacked the training and ability to formulate and monitor meaningful individual treatment goals. As a result, treatment goals were not functioning to organize, structure, and guide treatment so as to meet the needs of the individual patients. As noted in the survey report, however, Western Reserve began using a new treatment plan form which appears to be in compliance with the mandates of the preliminary injunction and Executive Order No. MH–5 in February 1977.

With regard to the extent and quality of therapeutic treatment at Western Reserve after the preliminary injunction, two studies were conducted by the research and evaluation team. The first study involved a review of the programs reported to be operating in the social re-education service from November 1976 to March 15, 1977. (Px 21). The data for this evaluation was collected through in depth structured interviews with all unit leaders and other programming personnel on said service. There were twenty-nine programs reported operating in November 1976, but only twenty-three operating programs in March 1977. Many of these were loosely and informally organized and structured. In March 1977, the reported programs included personal hygiene, homemaking, exercise, reading and writing. Although almost every cottage in the service area had individual counseling programs, such were not included within the scope of the survey.

As to the 23 programs operating on March 1, 1977, few had clearly defined goals which conformed with recognized quality standards. Further, not one cottage was

9. Executive Order No. MH–5 mandates that each patient at an institution under the department's responsibility have an individualized treatment plan which is consistent with his limitations, abilities, problems and needs. It sets forth in detail the manner for its implementation and the contents of the treatment plans. This order became effective on December 15, 1975.

found to have written unit goals measurably describing the skills expected of the patients prepared to move to a higher functioning level cottage. Additionally, many of the programs then operating lacked coordination with not only the cottage goals, but also the rather ambiguous goals of the social re-education service area. It was further found that patient flow into, through and out of said service area did not conform to Western Reserve's policy of organized and sequential patient movement from lower to higher functioning cottages. According to unit programming personnel, the restrictions affecting program development and implementation included skill deficiencies of staff, lack of supplies or resources, limited opportunities for community activity, and bureaucratic blockage. In summary then, the research and evaluation team concluded that the social re-education area therapeutic programs were confused, nebulous, and ambiguous.

The second study of nonmedical treatment at Western Reserve was completed in June 1977. (Px 169). It examined four different aspects of such treatment: observation of social re-education service programs reported to be functioning in order to determine to what extent they were actually operational; evaluation of social re-education programs in terms of goals, flow and constraints; survey of activity therapists so as to determine their role in program development and implementation; and a programming skills survey to ascertain adequacy of staff skills. The results of the study showed that only 32% of the sample programs in the social re-education service were operational on the day observed. As to the program goals and components in said service, the observations made and conclusions reached essentially paralleled those of the first study discussed above.

The survey of activity therapists assigned to the units and primarily responsible to unit leaders, as opposed to the activity therapy coordinator, revealed that they lacked the skills necessary to adequately identify patient needs and formulate appropriate goals and programs. They were however,

eager to learn or receive inservice training in effective program intervention and strategies. Moreover, although state and Western Reserve guidelines stipulate that a comprehensive activity therapy program should provide educational, vocational and recreational activities, most of such programs at Western Reserve are recreational in nature. Finally, the survey of staff programming skills demonstrated that many lacked the skills necessary to define meaningful goals and to develop and implement the appropriate methodology. In view of their generally positive attitude, however, it was observed that effective programming was possible if intensive staff training was provided.

Therefore, based on all of the data collected and analyzed, the research and evaluation team concluded that in most instances therapeutic unit programs at Western Reserve were not adequate, frequently poorly developed, and usually not skillfully administered. Thus it is apparent that after the entry of the preliminary injunction on May 3, 1976, there continued to be serious problems and deficiencies in the provision of therapeutic treatment. However, a number of nonmedical treatment programs and activities have been created and implemented since the preliminary injunction. These have been on both a unit and hospital-wide basis. Without detailing all of these programs, the Court deems it appropriate to highlight some of the more significant ones.

In the intensive unit, a part of the incoming service, a couple of new and rather progressive therapeutic programs have been developed. During the summer of 1977, staff were trained by the Blick Clinic in relaxation, and such a program was being offered patients at Western Reserve at the time of trial. Further, the unit has commenced using a developmental disabilities treatment program in conjunction with said clinic.

The personal rehabilitation service provides care and treatment to the lowest functioning patients at Western Reserve; generally, they are very regressed, signifi-

cantly disoriented, and lacking basic self-care, self-help and social skills. The primary therapeutic program provided both males and females is behavior modification. Such program utilizes a token economy whereby proper and improved behavior is rewarded by tokens exchangeable for various items. This service area has also developed a family involvement program to facilitate contact with patients' families. It involves family counseling sessions conducted by a psychologist with informal, individual follow-up in an effort to reestablish the patient within the family group. Further, each patient in the personal rehabilitation service has a prime therapist who is a staff member specially designated to develop a close, one-on-one counseling relationship. Prime therapists are used in other services as well, such as social re-education.

In October 1977, the Orleans Community Center opened as a result of efforts by a unit leader in the social re-education service. The center is a structure in the community which has classrooms, a gymnasium, and an auditorium. It provides daily classes and programs for patients from said service and other services; the programs include community orientation, cooking, sewing, and budgeting. Further community involvement has been provided some patients in the social re-education service through a program with the Kent State University psychology clinic. Six patients are taken to the university for weekly counseling services after which they and accompanying staff remain in Kent for the evening so that the patients may become familiar with the community.

With regard to hospital-wide programs, there is a central activity therapy service which consists of four sections: occupational therapy, music therapy, recreation therapy, and the residents' library. In occupational therapy, for instance, classes are offered to patients in such craft areas as ceramics, needlework, weaving and woodwork. Patients may sell their finished handicrafts at the hospital store. Various programs for both individuals and groups are offered in the other sections; patients attend sessions either through voluntary action or as part of a specific individual treatment program.

A work training program is also offered patients at Western Reserve. This program is coordinated by the program development section and gives patients an opportunity to work with Western Reserve employees in such areas as maintenance and food service. Around June 1977, there were 32 patients participating in this particular program.

In April 1977, Western Reserve initiated the Hejira program, an adult education program designed to develop and build those skills necessary for community survival. Essentially, it consists of a series of courses in five skill areas: interpersonal communications; personal maintenance; community membership; academic achievement; and personal enrichment. Hejira is open to all patients and staff, and offers courses ranging from remedial reading to self-medication to beginner's typing.

Thus there have been improvements in therapeutic programming at Western Reserve since May 3, 1976. Yet overall nonmedical treatment programs and activities continued as of the time of trial to be generally inadequate and insufficient. Such deficiencies appear to be attributable largely to staff inadequacies.

Further, there has been, and continues to be, a serious deficiency in the area of vocational training at Western Reserve. The only real program providing such has been the work training program discussed above. Such program is clearly insufficient to provide vital prevocational and vocational services to Western Reserve's patient population.

Western Reserve's failure to adequately address the vocational needs of its patients is attributable to several factors. One major factor has been the absence of qualified staff to institute and implement vocational training programs. Another factor has been the lack of resources in terms of supplies and equipment with which to provide such meaningful activities. Third, it appears that Western Reserve has considered the Bureau of Vocational Rehabilitation, a

bureau or division of the Ohio Rehabilitation Services Commission, to be primarily responsible for the provision of vocational services and has acted accordingly. Further, communication and cooperation between Western Reserve and the Bureau of Vocational Rehabilitation has been exceedingly poor and there has been no effective coordination of vocational services.

Recognizing the inadequacy of Western Reserve's vocational services and in an effort to provide comprehensive treatment programs, a major effort was undertaken in 1977 to coordinate the provision of vocational services by Western Reserve and the Bureau of Vocational Rehabilitation. In September 1977 an agreement was entered into by the Division of Mental Health of the Ohio Department of Mental Health and Mental Retardation and the Ohio Rehabilitation Services Commission for the provision of rehabilitation services to patients at all state hospitals. (RSCx C). Pursuant thereto the department assumed responsibility for hospital based vocational rehabilitation, prevocational services, while the commission assumed responsibility for community based vocational rehabilitation services. Thereafter a task force of representatives from the department and the commission was authorized to develop and draft a plan for a workable, coordinated vocational program at Western Reserve. The result thereof is the Plan for Cooperative Hospital/RSC Services which implements the state-wide agreement at Western Reserve, and provides a detailed framework and guidelines for an integrated and coordinated system of vocational services. (RSCx Z4). This plan represents a comprehensive approach to remedy the deficiencies in vocational programming and to achieve quality prevocational and vocational services for patients at Western Reserve. Thus, its implementation will assure the provision of an adequate vocational training program.

*ALTERNATE SETTINGS*

The goal of Western Reserve is to provide each patient with treatment so that he can become a functional and productive member of society. Although effective rehabilitation can take place within the hospital, today treatment within the community is generally preferred by most mental health professionals. Said professionals consider treatment in community based settings to be the best and most effective approach to mental illness. It is plaintiffs' claim that defendants have failed to provide treatment in assertedly least restrictive community settings.

Although a large number of Western Reserve patients could be treated outside the hospital, there are essentially three groups of patients who would not benefit from community based care and treatment. First, the forensic or dangerous patients would not prosper therefrom, but would remain a danger to themselves and others in the community. Said patients would not benefit in terms of their mental health by being placed in a setting outside of the hospital. Second, nonambulatory geriatric patients without relatives are probably prospering better at Western Reserve than they would in the community. They are receiving care and treatment within an attractive skilled nursing home or intermediate care type setting appropriate to both their physical and mental needs. Third, a small group of chronically mentally ill with organic brain syndrome would not benefit from community treatment. Due to the nature of such syndrome, a community setting would not provide services adequate to meet their needs; these patients include the neurologically impaired and paraplegics with additional emotional and mental problems.

Thus in February-March 1977, the various unit staff identified 400 patients then at Western Reserve who could receive care and treatment under alternate circumstances if adequate community services and residential settings were available. (Px 59). Essentially five different types of settings and services would be needed for these patients: an intensive care facility with around the clock supervision; a mild mental nursing home stressing psychosocial rehabilitation, and providing some supervision and daily care, recreation and activity therapy

at the facility; a structured halfway house where self-care is periodically checked, a supervisor lives on the premises, and programs are supervised both outside and within the facility; family care homes providing self-care, a live-in homemaker, co-operative food preparation, a sheltered workshop on or off the premises, and rehabilitative activities in an outside agency; and group homes, family placements or independent living with complete self-care, a skilled mental health worker available for twenty-four hour crisis intervention, and support services with community agencies. The vast majority of those patients able to receive community oriented treatment were not, however, ready for the least supervised and structured or independent setting. Rather, 28% would require the structured halfway house placement, 25% would need a nursing home type setting, and 21% would require the intensive care facility. Therefore, despite the fact that at least half of Western Reserve's patient population has been considered proper for community treatment, most still need the extensive care, treatment and supervision for which Western Reserve was designed.

As of November 30, 1977, 284 of the above identified patients were still residing at Western Reserve. (Px 160). Of that number, a structured halfway house would be necessary for 28%, a mild mental nursing home for 31%, and an intensive care facility for 22%. Thus it appears that the overwhelming majority still required the same kind of care and constant or near constant supervision provided at Western Reserve.

Within the nine month period from March through November 1977, Western Reserve discharged 109 of the patients identified as able to receive care and treatment in an alternate setting outside the hospital.[10] (Px 160). The largest number discharged, 32, were placed in group homes. Another 24 patients were discharged to a sponsor's, relative's, or friend's home, while 20 other patients were placed in nursing homes. Further, 20 patients were discharged on their own or to their own home, apartment or room.

The relatively low number of discharges of Western Reserve patients is attributable primarily to a lack of appropriate community services and residential facilities. There simply are not adequate facilities and programs available within the community to properly care for and treat the chronically mentally ill patients residing at Western Reserve. There are not sufficient numbers of such residential facilities as family care homes, halfway houses, quarterway or three-quarterway houses, and settlement houses. Further, there are few apartments or independent living situations within the financial capability of these patients; many lack the money or resources which would enable them to be self sufficient. Additionally, there are not sufficient support programs providing medication monitoring, counseling, and rehabilitation activities to former mental patients residing within the community. Similarly there are insufficient numbers of sheltered workshops and other job opportunities for qualified patients.

Recognizing the desirability of placing patients within the community and keenly aware of the lack of community based treatment, Western Reserve began in 1975 to develop both residential and nonresidential community treatment facilities. Since 1976, Western Reserve has been directly responsible for initiating the development of six such facilities. The first major facility begun in 1976 was the Brecksville Lodge. This is a former Girl Scout camp located within the Brecksville Reservation of the Cleveland Metropolitan Park System. It is both a day and overnight facility where patients can learn basic outdoor living skills in an environment totally divorced from the hospital setting. For example, groups of patients have spent a weekend at the lodge and have been responsible for all daily chores ranging from cooking to cleaning.

In December 1976, Western Reserve purchased a house in Akron for use as a transitional housing facility or halfway house.

10. During that period of time seven such patients died at Western Reserve.

Originally the Akron project was planned to house 11 residents; due to zoning restrictions, however, only five residents were initially going to reside there. Nevertheless the facility was being renovated to accommodate 11 patients and eventually it is hoped that such number will reside there. Efforts in the renovation and development of the Akron facility had been halted at the time of trial, however, by a temporary restraining order issued by the common pleas court upon the request of area residents. Such resistance to the development of community mental health programs and facilities has been a common experience of Western Reserve staff. In fact, the purchase of another house for Western Reserve patients has been thwarted by a community group in a Cleveland suburb.

One of the defendants in the law suit against the Akron halfway house was Western Reserve Human Services, a nonprofit organization with a mental health delivery program serving that area of Summit County in which the Akron housing project property is located. Such group is to provide the staffing, counselors and other persons who would be in charge of the after care programming for Western Reserve residents in the Akron halfway house.

The Euclid halfway house in the Cleveland area was developed during the same time period. The property purchased in December, 1977 consists of a fifteen suite apartment house. This project is also designed to serve as a transitional living facility in that it is hoped that the patients will eventually move into their own independent living situation. The programming for residents of the Euclid halfway house is to be provided by the Panta Rhei organization. Essentially Panta Rhei is both a residential and nonresidential mental health treatment facility. It has a live-in lodge and vocational training center with several attendant businesses attached to it.

Probably one of the more innovative projects initiated by Western Reserve is the Kent State project. This project consists of a dormitory at Kent State University which at one time housed up to 70 students.

Western Reserve is, however, to use the structure as a transitional residence facility for no more than 16 persons. Three kitchens have been installed in the facility, and there will be both programming and living space. Western Reserve is to provide most of the staffing for the Kent State facility, but will also try to involve university students in the project. Sixteen patients were to be moved into the Kent State residence in February 1978.

The final two community programs developed by Western Reserve have been discussed above. They are the Orleans Community Center and the Hejira school program. Essentially both are day treatment programs based in the community.

These projects reflect the commitment on the part of Western Reserve to place its patients in the community. Indeed Western Reserve has made a determined effort since 1975 to identify community services for its patients. It has demonstrated a clear willingness to work with the community in the development of mental health services for the chronically mentally ill. There have not, however, been any residential facilities developed since January 1976 by community agencies in Cuyahoga, Geauga, Lake and Lorain Counties for the purpose of providing services to the chronically ill. Such is the result of basically four variables: a noncommitment on the part of community resources to provide services to the chronically mentally ill; the lack of resources; the primitive state of the art with respect to intermediate care alternatives such as halfway houses and group homes; and management deficiency.

To encourage community involvement in the development of a comprehensive system of both residential and nonresidential mental health treatment facilities, the department has sought and secured the funding necessary to begin realizing its goals. A new appropriation bill, House Bill 618, has provided a capital budget of new funds, in addition to the operating budget, for improvements of both state institutional and community facilities, and for expansion of new facilities. In conjunction therewith,

the department has set forth policies and priorities for implementation of such bill. (Dx R–6). As stated therein:

> H.B. 618 is considered to be most important in that it further encourages and facilitates the development of community programs as alternatives to State institution programs and thus aids the department and communities in attaining the goal of maximum deinstitutionalization, along with the adequate expansion of programs for persons now in communities.

The most significant portion of this policy is the potential for up to 100% state funding for those community mental health projects which meet the highest priority of the department. Said priority is to provide effective community based alternative programs for individuals who have resided in state mental institutions for six continuous months or more, and to provide for replacement and emergency repair of essential community facilities. Thus those facilities which serve a client population comprised 75% or more of individuals who have been patients at state institutions may be funded 100% by the state. Further, the policy provides for 90% state funding for those facilities that are open equally to persons within the community or from state mental institutions if the facility is to serve a designated high poverty area. This is an extremely important feature because the need for mental health services is acute in high poverty areas.

In late August 1977, the department submitted "A Proposal for a Statewide CSS Strategy Development Project" to the National Institute of Mental Health of the Department of Health, Education and Welfare (HEW). (Dx W–1). Said proposal was submitted in response to a request for proposals for funding sent to the states by HEW. It appears that HEW was interested in contracting with the states for the development of model programs for the improvement of community support systems for the mentally ill. The Ohio proposal was one of 15 state proposals which was endorsed and approved, and to which the National Institute awarded a contract for de-velopment of the program. Essentially the proposal is a detailed plan for the organization and development of a statewide community support system for mentally disabled persons. It is further evidence of the department's resolve to develop and utilize community facilities for the care and treatment of the chronically mentally ill. Further it shows a concern on the part of the department to proceed in an orderly, organized and comprehensive manner in order to prevent the placement of mentally ill individuals in substandard facilities without the necessary community support, and with the resulting return of large numbers to state institutions.

Based on the foregoing, it is clear that at least since 1976 both the department and Western Reserve have made considerable efforts to secure the development and to develop both residential and nonresidential community treatment facilities. They have made deinstitutionalization a priority, and have sought and found well-considered placements for chronically mentally ill patients. Therefore, the Court is unable to find that the defendants have wholly failed to provide treatment in alternate community based settings. Rather, they are making commendable strides, although admittedly slowly, toward the provision of the most effective environment for patients at Western Reserve.

## LEGAL ANALYSIS

The Court, having carefully reviewed and analyzed the foregoing facts, shall now address plaintiffs' claims for relief. As more fully developed below, the Court concludes that plaintiffs' Fourteenth Amendment claims and Ohio statutory law are dispositive of this action. Thus the Court deems it inappropriate and unnecessary to discuss in detail plaintiffs' asserted right to protection from harm under the Eighth Amendment.

### RIGHT TO TREATMENT

Perhaps the most critical issue raised in this action is whether plaintiffs and the members of the class they represent have a constitutional right to treatment. Defen-

dants contend that such issue is not involved in this proceeding. The Court, however, disagrees.

■ Initially, it is well-established that the state has no constitutional obligation to provide services to its citizens. *Cf. Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Where a state undertakes to do so, such is essentially a matter of state concern; generally state law and not the Constitution governs. State action may, however, implicate constitutional guarantees.

■ The involuntary civil commitment of an individual to a state mental hospital involves a substantial deprivation of liberty within the meaning of the Due Process Clause of the Fourteenth Amendment. *Addington v. Texas,* —— U.S. ——, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972). The state clearly cannot accomplish such confinement with its accompanying abridgment of personal freedoms and severe stigmatization of the individual without due process of law. *Specht v. Patterson,* 386 U.S. 605, 608, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967). This deprivation of liberty must be justified by some permissible and legitimate state interest, and the reason for commitment of a particular individual must be established at an appropriate proceeding. *O'Connor v. Donaldson,* 422 U.S. 563, 580, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (Burger, C. J., concurring). Further, as stated by the Supreme Court, "due process requires that the nature and duration of commitment bear some reasonable relation to the purposes for which the individual is committed." *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972). Thus involuntary confinement can no longer be justified and must end when the bases therefor cease to exist. See *McNeil v. Director, Patuxent Institution,* 407 U.S. 245, 249–50, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972).

■ Essentially, there appear to be two purposes for involuntary civil commitment advanced by a state: fulfillment of its historic *parens patriae* function; and accomplishment of its police power objectives. See Note, *Developments in the Law: Civil Commitment of the Mentally Ill,* 87 Harv.L. Rev. 1190, 1326 (1974) [hereinafter cited as *Developments in the Law* ]. Pursuant to the *parens patriae* rationale, commitment of the mentally ill is based upon the need for care and treatment or protection from harm. The state undertakes to act as parent or guardian of the mentally disabled individual, and determines that in his best interest he requires or would benefit from treatment, is not capable of so acting for himself, and/or presents a significant risk to his well being as a result of his inability to responsibly recognize his needs. Thus a statute furthering the *parens patriae* interest of the state typically authorizes civil commitment of those who are a danger to self or in need of treatment. In those instances where the *parens patriae* rationale that the patient is in need of care and treatment is the justification for confinement, such must be provided. In other words, if the purpose of commitment is care and treatment, due process requires, at the least, the provision of care and treatment. See *Donaldson v. O'Connor,* 493 F.2d 507, 521 (5th Cir. 1974), *vacated and remanded,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

■ Under the police power rationale, involuntary civil commitment of the mentally ill is premised upon the state's power and concomitant duty to protect the public from harm or a threat of injury to their person or property. Thus state statutes authorize the confinement of those individuals found to be dangerous to others. In such case, civil commitment promotes or furthers a societal interest rather than the individual interest of the mentally ill. See Note, *Developments in the Law, supra* at 1222. Although the public interest predominates, the individual's interest in and need for treatment is often also within the contemplation of the state. Thus the state may combine the exercise of its police power with its *parens patriae* function in committing those individuals found to be dangerous to others. Such reflects a recogni-

tion that few mentally ill are actually dangerous to society, and that the dangerous propensity of those few stems from their deficient mental or emotional condition. Therefore, whenever the provision of care and treatment is part of the purpose for confinement, such must be accorded consistent with due process.

■ Therefore, the Court concludes that to the extent the state involuntarily commits an individual to a mental hospital either in whole or in part for the purpose of treatment, the failure of the state to provide treatment constitutes a deprivation of liberty in violation of the Fourteenth Amendment. Further, the Court specifically finds that there is no constitutional right to treatment existing by itself, separate and independent of the constitutional right to liberty. The right of any individual to treatment exists only by reason of, and is wholly dependent on, derived from and concomitant with a deprivation by the state of the individual's Fourteenth Amendment liberty right for the purpose of treatment.

■ Further, the Court concludes that to the extent a state commits an individual to a mental institution solely to protect him from harm, the state's failure to provide treatment does not violate the Fourteenth Amendment. At most, such individual is entitled to be protected from harming or injuring himself; he has no right to treatment. Similarly, when a state in the exercise of its police power confines a person in a mental institution solely upon a finding that he is dangerous to others, due process does not require that the state provide him treatment. Such dangerous mentally ill individual has no Fourteenth Amendment right to treatment.

■ The question next arises concerning the nature of treatment to which the mentally ill involuntarily confined for the purpose of treatment are entitled. Upon consideration, the Court concludes that minimally adequate treatment is required by due process. Such is, however, a legal standard which can only derive meaning and be defined by reference to the facts. In so doing, the Court takes notice that psychiatric evidence reflects:

the uncertainty of diagnosis in this field and the tentativeness of professional judgment. The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment.

*Greenwood v. United States*, 350 U.S. 366, 375, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956). Today, uncertainty and fallibility are still characteristic of psychiatric diagnosis. See *Addington v. Texas, supra* at ——, 99 S.Ct. 1804. This lack of finality and definiteness does not, however, relieve the Court of its duty to render an informed decision. *Rouse v. Cameron*, 125 U.S.App.D.C. 366, 373 F.2d 451, 457 (1966). Nor is the Court powerless to determine whether adequate treatment is present where such is the ground for depriving an individual of his liberty. *O'Connor v. Donaldson*, 422 U.S. 563, 574 n.10, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Thus it cannot reasonably be said that the determination of what constitutes minimally adequate treatment is beyond judicial competence.

■ Recognizing the complexity of mental illness and the myriad types of available treatment, the Court cannot and shall not determine what is minimally adequate treatment by prescribing or requiring the provision of specific therapies for each affected plaintiff. Rather, the Court deems it appropriate to formulate minimum standards of adequate treatment. Such standards are applicable to all mentally ill individuals involuntarily confined for the purpose of treatment; they are designed to insure the provision of adequate treatment, and are necessary for appropriate and effective treatment. See Note, *Developments in the Law, supra* at 1337.

■ Based on the evidence presented herein, the Court finds that there are four standards generally advanced by mental health professionals as essential for minimally adequate treatment: a humane and therapeutic environment; qualified staff in sufficient numbers; an individualized treat-

ment plan for each patient; and planned therapeutic programs and activities. *Cf. Wyatt v. Stickney*, 334 F.Supp. 1341, 1343 (M.D.Ala.1971), *standards enforced*, 344 F.Supp. 373 (M.D.Ala.1972), *aff'd in part, rev'd in part, remanded in part, sub nom., Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974). It is against these standards that the conditions at Western Reserve must be measured in order to determine whether defendants have failed to provide treatment to those mentally ill individuals involuntarily confined for such purpose in violation of the Fourteenth Amendment.

▉ Upon consideration of the entire record in this action, the Court concludes that, prior to and after the entry of the preliminary injunction on May 3, 1976, defendants failed to provide minimally adequate treatment to mentally ill patients involuntarily confined at Western Reserve for the purpose of treatment in violation of the Fourteenth Amendment. Yet since the preliminary injunction, significant strides have been taken toward the provision of adequate treatment. At this time, however, the Court deems it unnecessary and inappropriate to further define and apply the four constitutional standards set forth above. This conclusion results from the passage by the Ohio legislature of a statute, effective April 1, 1977, granting all patients at state mental hospitals specific treatment rights which at the least meet, if not surpass, the constitutional standards of minimally adequate treatment. Therefore, the Court shall further define and determine adequate treatment by interpreting the applicable Ohio statute.

Commencing April 1, 1977, both voluntary and involuntary patients at Western Reserve have a clearly defined statutory right to treatment under Ohio law. Specifically, section 5122.27 of the Ohio Revised Code provides, in pertinent part:

The head of the hospital or his designee shall assure that all patients hospitalized pursuant to Chapter 5122. of the Revised Code shall:

. . . . . .

(B) Have a written treatment plan consistent with the evaluation, diagnosis, prognosis, and goals which shall be provided, upon request of the patient or patient's counsel, to the patient's counsel and to any private physician or licensed clinical psychologist designated by the patient or his counsel or to the legal rights service.

(C) Receive treatment consistent with the treatment plan. The department of mental health and mental retardation shall set standards for treatment provided to such patients, consistent wherever possible with standards set by the joint commission on accreditation of hospitals;

(D) Receive periodic reevaluations of the treatment plan by the professional staff of the hospital at intervals not to exceed ninety days;

(E) Be provided with adequate medical treatment for physical disease or injury;

(F) Receive humane care and treatment, including without limitation, the following:

(1) The least restrictive environment consistent with the treatment plan;

(2) The necessary facilities and personnel required by the treatment plan;

(3) A humane psychological and physical environment within the hospital facilities;

(4) The right to obtain current information concerning his treatment program and expectations in terms that he can reasonably understand;

(5) Participation in programs designed to afford him substantial opportunity to acquire skills to facilitate his return to the community;

(6) The right to be free from unnecessary or excessive medication;

(7) Freedom from restraints or isolation unless it is stated in a written order by the head of the hospital or his designee, or the patient's individual physician or psychologist in a private or general hospital.

As is readily apparent, this statute sets forth rather detailed and extensive treatment requirements. The Court's inquiry

shall thus focus essentially on seven basic treatment rights accorded thereby.[11]

Initially, Ohio law requires an individualized treatment plan for each patient. Such plan consists essentially of a recognition of the patient's specific needs, an identification of the goals or reasonable objectives of treatment, and the establishment of a therapy program appropriate to achievement of said goals. As discussed above, the individual treatment plans of patients at Western Reserve on September 15, 1976 failed to comply with the requirements of the preliminary injunction and Ohio Department of Mental Health and Mental Retardation Executive Order No. MH–5. In February 1977, however, use of a new treatment plan form, which is apparently in compliance with both orders, was begun.

Based upon the evidence presented in this action, the Court cannot find that defendants have developed and implemented adequate individualized treatment plans for all mentally ill patients at Western Reserve. Recognizing that such are necessary for an effective treatment program, defendants shall forthwith thoroughly evaluate all patients at Western Reserve, and formulate and implement an individualized treatment plan for each patient. Said treatment plans shall include each of the assessments and statements required by the preliminary injunction and Executive Order No. MH–5. Further, defendants shall implement and update the individualized treatment plans as required by Executive Order No. MH–5, and Ohio Revised Code §§ 5122.27(B), (C), and (D).

Additionally, the Court finds that the inadequacies in the individualized treatment plans at Western Reserve are attributable in large part to the staff's lack of skill and training in the formulation thereof. Thus, defendants shall commence a program of inservice training and continuing education in the design, implementation, and monitoring of meaningful individualized treatment plans. Said training and continuing education program shall be required for all staff who are members of the unit treatment teams, or are otherwise involved in patient evaluation or the formulation, implementation and monitoring of treatment. Further, defendants shall submit to the Court a plan for compliance with the foregoing directives.

With regard to the requirement that all patients be provided adequate medical treatment for physical disease or injury, the Court has extensively discussed the medical care and treatment provided at Western Reserve. Although subsequent to April 1, 1977, there have been deficiencies in medical care and instances of inadequate treatment, such have been limited in number and have not been shown to be representative of the overall level and quality of physical care and treatment. Rather, the medical care and treatment provided Western Reserve patients generally meets minimally acceptable community standards. Therefore, the Court concludes that defendants have provided the adequate medical treatment required by the law of Ohio to essentially all patients residing at Western Reserve. Defendants shall assure that all present and future patients are provided adequate medical treatment for physical injury or disease.

The requirement of a humane environment under Ohio law encompasses both psychological and physical factors. Included among the former are incidents of privacy, human dignity and individual self-esteem. In other words, the conditions of a patient's confinement must contribute to a positive psychological environment which enhances the patient's self-worth. Thus an area in which an individual can be on his own and a space for personal belongings are essential to a patient's privacy. Similarly, separate toilet facilities and adequate sanitary and personal hygiene products foster a patient's perception of his dignity. Additionally, this standard requires that the physical conditions of the patient's environment be safe and not hazardous to his person. Further, there must be adequate room for therapeu-

11. The requirement of the less restrictive environment shall be discussed in the next section herein entitled "Right To Treatment In The Least Restrictive Setting."

tic activities and programs, and such space must be conducive to intervention.

As found above, the conditions existing at Western Reserve prior to May 3, 1976 clearly did not constitute a humane and therapeutic environment. Rather the environment was psychologically dehumanizing and physically dangerous. The preliminary injunction, however, sought to rectify such conditions by mandating improvements to the buildings wherein patients reside. Specifically, it required defendants to prepare a plan to remedy deficiencies in the physical plant; such was to include improvements in life safety conditions, sanitary conditions, privacy, and therapeutic environment. These improvements were to be made by March 1, 1978, except that the completion date for a proposed forensic center which would meet the requirements of the Order could be deferred until September 30, 1978.

It appears that in compliance with the preliminary injunction, defendants undertook an extensive renovation and improvement program at Western Reserve. As a result, Western Reserve is no longer a dangerous, unsafe place wherein adequate treatment is not being, and cannot be, provided. Thus the Court cannot conclude that Western Reserve is presently not a humane psychological and physical environment for the mentally ill with one exception. That one exception is cottage 21.

As found above cottage 21 does not constitute a humane and therapeutic environment. On the contrary, such cottage is a hazardous and unsafe place for patients. There are numerous problems with the physical condition of the facility including poor security, inadequate ventilation, doors which fail to meet fire safety code requirements, and cracks in the building foundation. Further, cottage 21 lacks sufficient and proper space and an appropriate therapeutic environment. Contributing to the poor psychological environment therein are the noisiness of the facility, absence of space where a patient can be by himself, and lack of individual storage facilities or lockers where a patient can safely keep personal possessions. Further, unlike other areas at Western Reserve, no significant improvements or renovations have been made to cottage 21 at any time prior to or after the preliminary injunction and continuing to the present.

Based on the foregoing, the Court concludes that defendants have failed to provide mentally ill patients residing in cottage 21 with a humane psychological and physical environment. Thus defendants shall submit a detailed plan for providing these patients with an adequate physical and psychological environment. The conditions thereof shall meet, at a minimum, the standards set forth in section V of the preliminary injunction, expand the treatment and programing space and render such conducive to therapy, and improve security in those areas wherein violent patients reside. The plan shall also contain a specific timetable for its implementation. Further, no new patients shall be admitted to units 21 E&F and 21 G&H, the forensic service units housing patients who are behaviorally violent or given to acting out behavior, from outside the other units or cottages until completion of the above described plan or further Order of this Court. In other words, defendants shall not admit to Western Reserve any patients who require initial and/or continuing care and treatment within the secure care units of cottage 21 until defendants provide a humane and therapeutic environment for such individuals.

Pursuant to Ohio law, the right to humane care and treatment includes the requirement of necessary personnel. Such requirement must be interpreted to mean qualified staff in sufficient numbers. As found above, Western Reserve had neither a numerically sufficient nor adequately trained and qualified staff prior to the preliminary injunction. Due to said Order, however, there has been a marked improvement in the number of both professional and nonprofessional personnel employed at Western Reserve. Thus as of November 5, 1977, the staff numbered 1023.0 which meant that there were 1.43 staff per patient.

Based upon the record herein, the Court concludes that the staffing required by the preliminary injunction and its amendments in terms of classifications and number of staff satisfies the minimally sufficient test for a patient population numbering no more than 725, with the following exceptions. (See Dx O). Although not required by the preliminary injunction, the Court concludes that the staff must include persons qualified to provide physical therapy, and speech and hearing therapy. Further, in determining that the staffing required under the preliminary injunction is acceptable, the Court implicitly concludes that the staffing level represented by the ratio of 1.4 staff per patient is numerically sufficient at this time and under currently acceptable standards for mental institutions serving the chronically mentally ill. Said staff-patient ratio must be maintained in all units at Western Reserve for the foreseeable future except as follows. Mentally ill persons who are suffering an acute condition and those who are behaviorally violent or dangerous require intensive care and treatment. Therefore, the Court concludes that in those units designated to care and treat these two categories of patients, the ratio of two staff per patient constitutes the minimum acceptable level of personnel at this time.

Therefore, defendants shall submit to the Court a report setting forth by appropriate classification the present staff levels at Western Reserve including therein the total number of staff and total patient population. Such report shall also show by classification the number of staff assigned to those units designated for the care and treatment of patients who are suffering an acute condition and those who are behaviorally violent or dangerous, the total number of staff assigned thereto, and the total number of patients residing therein. Further, should the current staffing levels fail to meet the provisions of the preliminary injunction and its amendments in terms of specific staffing requirements, and/or the staff-patient ratios found to be minimally sufficient, defendants shall submit a specific plan for meeting same. Said plan shall state in detail the manner in which defen-

dants shall provide and maintain sufficient staffing and the timetable for compliance with this Order's staffing requirements.

The provision of adequate treatment requires not only sufficient numbers of staff, but also sufficiently qualified staff. As the Court has previously found, prior to the preliminary injunction the staff at Western Reserve was generally poorly trained, educated and experienced, and the training programs provided were either virtually nonexistent or basically inadequate. Pursuant to the preliminary injunction, however, a program of initial and continuing education and training for all staff was to be commenced at Western Reserve. Although an education service has been established, it has yet to consistently and satisfactorily provide the continuing education necessary to insure that staff render care and treatment commensurate with the patients' needs.

In view of the foregoing, the Court concludes that the staff at Western Reserve has neither been sufficiently qualified nor provided sufficient training and education in order to provide minimally adequate humane care and treatment. Thus defendants shall hire and employ only those physicians who meet all licensing and certification requirements of the State of Ohio for persons engaged in the private practice of the same profession. Further, in addition to the training and education requirements of the preliminary injunction, defendants shall give each new staff member a formal, structured orientation program appropriate to that person's position and the needs of the patients. Defendants shall prepare and distribute to each new and current staff member a manual or handbook containing such information as necessary to insure the provision of adequate care and treatment for all patients consistent with this Order, the law of Ohio, and the policies of the Department of Mental Health and Mental Retardation. Further, defendants shall develop and implement a planned program of training and continuing education for all staff with patient contact. Such program must be adequate and appropriate to the

staff member's position and the needs of the patients. Also, defendants shall encourage participation in courses and seminars at neighboring universities, and other specially sponsored programs which relate to staff responsibilities and patients needs.

Ohio law provides that all mentally ill persons in a state hospital are entitled to participate in programs designed to allow them to acquire those skills which will facilitate their reentry into the community. As the Court has previously found little therapeutic programing and meaningful activity was occurring at Western Reserve prior to May 3, 1976. Although important strides have been made since the entry of the preliminary injunction, the overall level of programing generally appears insufficient. Adequately planned and regularly scheduled programs and activities are not consistently and uniformly available to all segments of the patient population. Indeed there continues to be a need for improvement in the provision of therapeutic treatment at Western Reserve.

In light of the record herein, the Court must conclude that defendants have failed to provide sufficient planned therapeutic programs and activities for all mentally ill persons at Western Reserve. Defendants shall thus submit to the Court a report setting forth a brief description of all current nonmedical programs and activities for patients at Western Reserve. Said description shall include a statement of the frequency or regularity with which the program or activity actually occurs, the patients for whom such is available, and the average number and category of patients who actually participate therein. In addition, defendants shall submit to the Court a plan for improving the overall level of nonmedical therapeutic programing and regularly scheduled activities.

Further, the Court finds that the failure to provide sufficient therapeutic programs and activities has been due, to a great degree, to an insufficient number of staff and inadequately trained staff. Therefore, the Court, having previously required specific staffing levels and training, concludes that the training and education provided both new and current staff must include the development and administration of meaningful therapeutic programs. Defendants shall thus commence an education program which will teach staff the skills requisite to the formulation and implementation of therapeutic programs and activities appropriate to the needs and treatment goals of patients.

Additionally, as discussed above, defendants have wholly failed to adequately address the vocational training needs of the patients at Western Reserve. There has been a serious lack of both prevocational and vocational services. The Plan for Cooperative Hospital/RSC Services, however, represents a concrete and comprehensive proposal to remedy such condition, and to insure the provision of adequate vocational programing. Thus defendants shall fully implement this plan.

Under Ohio law, all patients at state mental hospitals have been granted the right to be free from excessive or unnecessary medication. The Court has previously reviewed the medication practices and administration of psychotropic drugs at Western Reserve. As found therein, beginning in late 1976, a number of programs and policies were initiated to assure appropriate medication prescribing practices and prevent any harmful effects of drug therapy or treatment. Thus, the Court cannot conclude that since April 1, 1977 defendants have violated the right of patients to be free from unnecessary or excessive medication.

Finally, the statutory right to humane care and treatment requires that all patients residing in a state mental hospital be free from restraints or isolation unless such is stated in a written order by the head of the hospital or his designee. It has been the policy of the department since at least June 28, 1973 to limit the use of restraints and seclusion in facilities for the mentally ill by requiring, inter alia, written orders therefor except in emergency situations. Based on the record herein, the Court must conclude that plaintiffs have not shown

that defendants have violated Ohio law by failing to assure patients freedom from unnecessary or unordered restraints or isolation.

## RIGHT TO TREATMENT IN THE LEAST RESTRICTIVE SETTING

It is further asserted that plaintiffs have a right to treatment in the least restrictive setting appropriate to their needs. This claim finds its source in the well-established principle that:

[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose. [Footnotes omitted].

Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). In other words, when the state interferes with an individual's fundamental rights, it must do so in a manner which is least burdensome or oppressive to the individual.

As discussed above, involuntary hospitalization involves a restraint of liberty within the meaning of the Due Process Clause of the Fourteenth Amendment. Due process requires not only that the nature of the confinement bear some reasonable relation to the purpose thereof, but also that the means used to achieve such purpose not unreasonably and unnecessarily infringe the individual's fundamental liberty interest. See Note, *Developments in the Law, supra* at 1246. Therefore, where the purpose of involuntary confinement is treatment, such must be provided by means which are least burdensome to the individual.

Thus a two-pronged challenge to involuntary commitment for the purpose of treatment has been set forth. It is first contended that where an individual is confined in the hospital for treatment, the conditions therein must be the least restrictive necessary to accomplish such purpose. Where, however, treatment outside the confines of a hospital environment is appropriate to an individual's needs, treatment must be provided that person in a community setting. It is asserted that the purpose of confinement, namely treatment, can be better achieved within the community and that such involves less of a restraint upon liberty.

As the right to treatment develops from the deprivation of liberty for that purpose, the touchstone of the Court's inquiry must be liberty. The concern is not whether the treatment is restrictive in terms of its effectiveness, but whether the method of treatment is overly restrictive of liberty. Thus if minimally adequate treatment can be provided in the hospital and such involves no greater restraint upon liberty than treatment outside the hospital, the mentally ill person confined for such purpose has no right to treatment within the community. Due process clearly does not incorporate and require the provision of the particular mode of treatment currently preferred by most mental health professionals. As long as treatment within the hospital environment does not by comparison unduly burden the individual's liberty interest, the Court cannot find that the Constitution requires the provision of treatment in alternate settings. On the other hand, where treatment in the hospital context is shown to be more restrictive of liberty than treatment in community based facilities, the Court must conclude that the failure to provide the latter constitutes a deprivation of liberty in violation of the Fourteenth Amendment.

In this action, plaintiffs have not sufficiently shown that treatment at Western Reserve is more restrictive of the liberty right of mentally ill persons involuntarily confined for the purpose of treatment than treatment in alternate community settings with one significant exception. That exception involves the relatively isolated location of Western Reserve and the lack of transportation between it and community resources. Said condition deprives these individuals of the many incidents of liberty such as freedom of movement and association. If transportation were readily availa-

ble to these mentally ill persons, however, Western Reserve would be no less burdensome of liberty than community facilities since provision of the same standards of treatment with their concomitant restrictions is required in either environment.

 Therefore, the Court concludes that by failing to provide those mentally ill persons involuntarily confined at Western Reserve for the purpose of treatment ready access to community resources, defendants have deprived such individuals of liberty in violation of the Fourteenth Amendment.

 As indicated above, however, since April 1, 1977 Ohio law assures all hospitalized mentally ill persons the "least restrictive environment consistent with the treatment plan." Ohio Rev. Code § 5122.-27(F)(1). This statutory right likewise relates to the patients' interest in liberty. In other words, it must be interpreted to provide at most that all patients are entitled to the minimum limitation or restriction upon their movement and activity which is necessary to and consistent with their treatment needs. Thus a patient must be given the maximum freedom consistent with his individual treatment plan. Where, however, a patient needs restrictions or secure care, his movement and activity can be so limited; such is not violative of his statutory right to the least restrictive environment. Thus as so interpreted this statutory right meets constitutional standards.

Therefore, based on the record herein, the Court concludes that it has not been sufficiently shown that defendants have violated Ohio law by failing since April 1, 1977 to provide all patients with the environment least restrictive of their liberty and yet consistent with their individual treatment plans, with one exception. Such exception involves the failure to make community resources readily available to those patients for whom such is consistent with their treatment needs. Defendants shall assure said patients ready and regular transportation or access to community resources.

 Thus the Court concludes that, contrary to the assertions of the parties herein, the language of the subject statutory provision does not by its terms require the placement of all patients in alternate community based facilities. Although such may be desirable and preferred by mental health professionals, the Court must conclude that an Ohio court interpreting this statute would not find it mandates that result.

## REHABILITATION SERVICES COMMISSION

Pursuant to federal and state law, the Rehabilitation Services Commission [hereinafter the commission] is the sole state agency in Ohio authorized and designated to provide vocational rehabilitation services to all eligible handicapped persons. 29 U.S.C. § 701 *et seq.*; Ohio Rev. Code § 3304.17. The primary function of the commission is to assist persons with a physical or mental disability which is a substantial impediment to employment and who could benefit in terms of employability from vocational rehabilitation services. It is not, however, charged with responsibility to assist those persons whose disability so limits their activities and functioning as to render nonexistent the chance of gainful employment.

Within the organizational structure of the commission, the Bureau of Vocational Rehabilitation [hereinafter the bureau] is responsible for the direct delivery of rehabilitation services to the client. It serves the entire handicapped population in Ohio with the exception of the blind and visually handicapped. The bureau offers a full range of vocational rehabilitation services including: medical, psychological, and vocational evaluation and diagnosis; vocational counseling, guidance, and placement; and rehabilitation and vocational training.

A local unit of the bureau is located on the grounds of Western Reserve. At the time of trial it was staffed by a counselor-manager, full-time counselor, and rehabilitation aide. The services provided directly by the counselors include counseling and guidance, and frequently job placement and follow-up. All other vocational services are generally purchased by the counselors from community mental health centers, physi-

cians, hospitals, clinics, rehabilitation facilities, universities, trade schools, and, on occasion, employers in the form of on-the-job training. The bureau has also provided transportation for Western Reserve patients to the community for such services.

Referral of Western Reserve patients to the hospital based bureau unit may be made by any member of the hospital treatment teams. Such is generally handled by the patient's prime therapist. Additionally, patients may make self-referrals to the bureau by merely walking in or contacting the counselors and requesting services.

In determining eligibility for vocational rehabilitation services, the bureau unit at Western Reserve utilizes the criteria set forth in the federal regulations implementing the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* Specifically, there is a two-fold requirement that eligibility be based only upon:

> (1) The presence of a physical or mental disability which for the individual constitutes or results in a substantial handicap to employment; and

> (2) A reasonable expectation that vocational rehabilitation services may benefit the individual in terms of employability.

45 C.F.R. § 1361.33(b). With regard to the first criterion, an individual must present "a physical or mental condition which materially limits, contributes to limiting or, if not corrected, will probably result in limiting an individual's activities or functioning." 45 C.F.R. § 1361.1(s). Such disability or condition is in turn a substantial handicap to employment if it impedes the individual's occupational performance by preventing him from obtaining, retaining or preparing for employment which is consistent with his abilities and capacities. 45 C.F.R. § 1361.1(bb).

The second requirement of eligibility involves an evaluation of an individual's potential to ascertain whether there is a reasonable expectation that vocational rehabilitation services may benefit him in terms of employability. As defined by the federal regulations, employability is an expansive concept which refers to:

a determination that the provision of vocational rehabilitation services is likely to enable an individual to enter or retain employment consistent with his capacities and abilities in the competitive labor market; the practice of a profession; self-employment; homemaking; farm or family work (including work for which payment is in kind rather than in cash); sheltered employment; homebound employment; or other gainful work.

45 C.F.R. § 1361.1(g). A handicapped individual must meet both requirements in order to be eligible for vocational rehabilitation services.

The determination of eligibility is made on a case-by-case basis by the local bureau unit at Western Reserve. The process commences after referral with a diagnostic study begun at the initial interview with the client. During the interview the counselor seeks to elicit information regarding the client's disability, functional limitations, family background, personality, education and work training, and the services requested. The client is asked to bring his ward chart to the interview. The counselor obtains medical data, psychological assessments if within one year, and information regarding the client's physical condition therefrom. In addition to these social and medical factors, the counselor also properly considers the client's motivation, level of medication, and community readiness which includes his ability to tell time, travel alone, and interact with others.

A second client interview is held in most of the cases referred to the bureau unit at Western Reserve. Generally, the bureau counselor provides occupational information and counseling to the client at this time. Thereafter, the client is referred for psychological and vocational testing. The purpose of such testing is to aid in the determination of eligibility and assist in the development of a vocational plan. It is now a standard procedure in all cases.

Based upon this diagnostic study, the bureau counselor generally makes a determination as to the client's eligibility for vocational rehabilitation services. If the client

meets the eligibility criteria, he is placed into active status on the bureau's caseload and services are provided to him. On the other hand, if it is determined that the client does not meet the requirements and services are thus not presently planned, his case will be closed. There is, however, a third option. When the client's rehabilitation potential cannot be determined based upon the diagnostic study alone, he may be placed in an extended evaluation status. See 45. C.F.R. § 1361.36. The purpose of extended evaluation is to determine the second requirement of eligibility, namely whether vocational rehabilitation services will benefit the client in terms of employability. This status allows the bureau to provide services necessary for the determination of rehabilitation potential to the handicapped client for a period of eighteen months. Such rehabilitation services include counseling, work evaluation, prevocational and vocational training, and personal adjustment. The extended evaluation period terminates with a finding that the client is either eligible or ineligible for vocational rehabilitation services.

During the period July 1, 1974 through June 1, 1977, a total of 311 referrals were made to the bureau unit at Western Reserve. These referrals represent cases that were formally opened and assigned initially to either referral or applicant status. Of the 311 referrals, the bureau counselors determined that 142 were eligible for services, while 176 were found to be ineligible after an initial assessment.[12]

A 20% random sample of the 176 cases closed as ineligible was analyzed by Dr. Durand F. Jacobs, an expert witness retained by the commission. His analysis revealed that there were two major reasons for case closure: the client could not be located; and the handicap was too severe. The former reason relates to the inability of local bureau personnel to find former patients after their discharge from Western Reserve. Such apparently has been due to insufficient discharge planning by the hospital staff, and referral only a few days prior to the actual discharge date. The second major reason for closure indicates that Western Reserve staff have not been adequately trained to identify patients appropriate for referral, and that communication between the treatment teams and the bureau counselors has been poor. On the other hand, Dr. Jacobs found that the bureau unit at Western Reserve was accepting marginal clients in terms of the criteria of eventual employability. He observed that:

> They [the bureau] were clearly giving them the benefit of the doubt regarding their potential for employment.
>
> They did this until it became undeniably apparent that the client was too handicapped or unmotivated to continue to receive BVR service.

(Transcript at 7119). Indeed it is clear that the patients at Western Reserve characteristically require extensive personal, social, and prevocational preparatory treatment before they are ready for vocational rehabilitation services and present a reasonable expectation of employability.

Prior to the summer of 1977, the bureau unit at Western Reserve prescreened hospital referrals. The practice of prescreening involved a determination not to formally open cases for the clients referred. The client was thus not placed in either the referral or applicant status and evaluated through a diagnostic study. Within the period July 1, 1974 through June 1, 1977, there were 94 client referrals to the bureau unit at Western Reserve for which a case was not opened at the time of referral. A third of such referrals were evaluated as presenting a handicap too severe to be then ready for rehabilitation services. In 25 other instances, the client, who had been referred by someone else, either refused services or was not interested at the initial interview with the bureau counselor. An additional 11 clients did not keep the follow-up appointment after referral. Further, with regard to 14 referrals, there was no indication in the bureau records as to the reason a

---

12. The number of clients found either eligible or ineligible for services is greater than the number of referrals since the former includes a carry-over from the previous fiscal year.

case was not opened. It need be noted, however, that a number of patients were referred more than once and each such referral was treated separately. Moreover, 10 patients did have their case opened by the bureau upon a subsequent referral. The number of client referrals for which a case was not opened, however, does strongly support the conclusion that there has been an absence of communication and agreement between Western Reserve and bureau staff regarding which patients would be an appropriate and willing referral.

Based on the evidence presented, there has been no showing that the prescreening practice, utilized only prior to mid-1977, resulted in the denial of vocational rehabilitation services to any Western Reserve patient who satisfied the eligibility criteria. Rather, even marginal clients were provided with a variety of vocational services. Indeed, consistent with the federally mandated priority on services to the severely disabled, bureau counselors recognize that clients cannot be excluded on the basis of the severity of their disability if they meet the two-fold eligibility requirements. The severely handicapped are those individuals with one or more serious physical or mental disabilities whose vocational rehabilitation requires multiple services over an extended period of time. See 29 U.S.C. § 706(13); 45 C.F.R. § 1361.1(w). The bureau attempts to work with such individuals and give them priority in time and services. Similarly, in accordance with the federal mandate that no upper or lower age limit be established which will alone result in ineligibility, the bureau counselors have determined that persons who are fifty years of age or older are eligible for services. Thus for fiscal years 1975 through June 1, 1977, 22 handicapped individuals who were in said age group were referred to the bureau unit at Western Reserve, and 10 such clients were found to be eligible for vocational rehabilitation services.

For fiscal years 1975, 1976 and 1977 through June 1, 1977, the bureau unit at Western Reserve closed 88 client cases as not rehabilitated and 86 client cases as rehabilitated. With regard to the clients on its caseload during this period, the bureau counselors placed 42 clients in competitive employment, 5 clients in the practice of a profession, 21 clients in homemaking and 18 clients in sheltered employment.

■ Essentially, plaintiffs claim that the commission has

1. failed to provide priority in services to the severely handicapped in violation of 29 U.S.C. § 701(1973) (amended 1978), and 29 U.S.C. § 721(a)(5)(A);

2. discriminated against the handicapped by reason of their handicap in violation of 29 U.S.C. § 794 and 45 C.F.R. § 84.4(a), (b)(1)(i);

3. established a residency requirement by allegedly serving only patients ready to move into the community in violation of 29 U.S.C. § 721(a)(14) and 45 C.F.R. § 1361.33(a)(2);

4. failed to make maximum use of resources in the community by assertedly not transporting Western Reserve patients to the community in violation of 29 U.S.C. § 721(a)(12);

5. discriminated on the basis of age since allegedly few persons over 50 years old have been served in violation of 45 C.F.R. § 1361.33(a)(1);

6. failed to provide a preliminary diagnostic study for evaluation of rehabilitation potential of each applicant by prescreening prior to mid-1977 in violation of 45 C.F.R. § 1361.34;

7. failed to determine ineligibility only by use of a beyond a reasonable doubt standard in violation of 29 U.S.C. § 722(c) and 45 C.F.R. § 1361.37(c); and

8. failed to provide vocational rehabilitation services to Western Reserve patients in violation of Ohio Revised Code § 3304.17.

Upon consideration of the record in this action, the Court concludes that plaintiffs have failed to sufficiently show each of their claims for relief. The evidence presented simply does not support the allegations that the commission has violated its duty under both federal and state law.

Rather, the Court finds plaintiffs' claims against the commission to be wholly without merit with one exception. This exception involves the prescreening practice utilized prior to mid-1977. As found above, however, such is no longer employed and, more importantly, has not been shown to have actually resulted in the denial of services to any eligible handicapped patient at Western Reserve. Indeed the record herein does not demonstrate that the commission wrongfully failed to provide vocational rehabilitation services to any eligible patients at Western Reserve.

Although the commission has not been shown to have violated its duty under federal and state law, the Court shall not dismiss it as a party defendant in this action. As found earlier, Western Reserve has totally failed to provide vocational services to its patients consistent with the requirement of minimally adequate humane care and treatment. Moreover, it is clear that the staff at Western Reserve lack the skill and training to provide such services and to make appropriate referrals to the bureau. However, as previously found, implementation of the Plan for Cooperative Hospital/RSC Services will assure the provision of adequate and quality vocational services to Western Reserve patients. The commission is an essential party to said plan, and as such is an integral source and provider of the vocational rehabilitation services that must be available to mentally ill persons at Western Reserve.

Therefore, in order to insure the Court's mandate that the Plan for Cooperative Hospital/RSC Services be fully implemented, the Court hereby finds the Rehabilitation Services Commission to be a necessary party for relief in this action, and denies its motion to dismiss.

## DEPARTMENT OF PUBLIC WELFARE

The Department of Public Welfare [hereinafter the welfare department] is the state agency designated by Ohio law to administer the social services and medical assistance programs authorized by Title XX and Title XIX, respectively, of the Social Securi-ty Act, 42 U.S.C. § 301 et seq., as amended. See Ohio Rev.Code §§ 5101.46, 5101.51. As such it is not a direct service agency, but rather receives and allocates federal funds to medical and social service providers. The welfare department thus has indirect supervisory control over the state and county agencies which provide services under the state's social services and medical assistance plans. Direct control over the actual expenditure of the funds and the determination of an individual's eligibility is exercised by the provider agencies.

Pursuant to legislative authorization, the welfare department has entered into contracts with the Department of Mental Health and Mental Retardation [hereinafter the department] for the provision of medical care and services under the Medicaid program (Title XIX), and other services under the Social Services program (Title XX). It has allocated to the department all the Title XX and Title XIX funds it has been required to disburse. The department in turn provides such services to eligible individuals either directly or through subcontracts with various agencies and entities.

Essentially, plaintiffs claim that the welfare department through its involvement with the department and its power over fund allocation and reimbursement is liable for the constitutional and statutory violations found herein. Specifically, they contend that it has failed to fulfill its obligations under federal law in the administration of the state social service and medical assistance plans to their detriment.

With regard to the Medicaid program, plaintiffs point to three statutory requirements which the welfare department assertedly has violated. First, if the state plan includes medical assistance to individuals 65 years of age or older who are patients in public mental institutions, it must show that the state is making satisfactory progress toward the development and implementation of a comprehensive mental health program including utilization of community facilities and other alternatives to institutional care. 42 U.S.C. § 1396a(a)(21). Although Ohio has been admittedly slow in

the development of such a program, the evidence presented does show that progress toward that goal is being made. To that end the welfare department has provided substantial Title XX funds to the department and the county welfare departments for developing community based services, programs and facilities for the mentally ill. Indeed it is clear that deinstitutionalization and the establishment of a comprehensive community support system for mentally disabled persons is being actively and affirmatively sought by the department with the aid of the welfare department.

The state medical assistance plan must also include a description of the standards and methods the state will use to insure that the medical or remedial care and services provided are of high quality. 42 U.S.C. § 1396a(a)(22)(D). It must further provide for periodic inspections of mental institutions to determine the adequacy of the care and services being provided, the necessity of continued placement of eligible patients in such institutions, and the feasibility of alternative institutional or noninstitutional services. 42 U.S.C. § 1396a(a)(26)(B). Pursuant to agreement with the welfare department, the Medical Advances Institute and the Ohio Department of Health survey Western Reserve periodically to evaluate its compliance with the conditions for participation in the Medicaid and Medicare programs. Essentially, said conditions constitute standards measuring a hospital's ability to deliver adequate care. In determining compliance for purposes of Medicare certification which in turn would qualify a hospital for participation in Medicaid, the health department initially looks to Western Reserve's accreditation by the Joint Commission on Accreditation of Hospitals (JCAH). Such accreditation entitles Western Reserve to be deemed in compliance with Medicare standards except with respect to the special conditions of participation for psychiatric hospitals. The health department survey is thus limited to determining compliance with such conditions which relate to medical records, staff requirements, utilization review, and institutional planning. It is, however, responsible for an overall appraisal of Western Reserve's physical environment.

Similarly, the Medical Advances Institute conducts a comprehensive and intensive periodic review of Western Reserve. It makes findings and recommendations regarding, *inter alia,* staffing, environment, medical care and treatment, and changes in the level of care for specific patients. The inspections and reviews made by both the health department and the Medical Advances Institute have identified deficiencies in the care and treatment provided patients at Western Reserve. As a result thereof, the hospital has undertaken efforts to eliminate such and to improve the quality of services rendered.

Further, the 1977 agreement between the welfare department and the department for the provision of care and services under the Medicaid program, Title XIX, requires that the division of mental health comply with the requirement for facility certification specified by the welfare department and health department, or with the accreditation requirements of the JCAH. (ODPWx B1). In that connection, the legislature has mandated that the department and all institutions under its supervision meet or exceed by July 1, 1979 the standards set by JCAH or, where applicable, medical assistance standards under Title XIX. Ohio Rev.Code § 5119.10. Additionally under the 1977 agreement, the division must insure the conduct of periodic medical inspections and reviews in compliance with the requirements of the welfare department handbook.

Based on the foregoing, the Court is unable to find that the welfare department has failed to fulfill its statutory duty to provide standards, methods, and inspections for insuring quality medical care and treatment. The record does not establish violations of the specific provisions of the Medicaid program, Title XIX, alleged by plaintiffs.

The Social Services program, Title XX, provides federal funds to the states for the provision of services directed at the goals of:

(A) achieving or maintaining economic self-support to prevent, reduce, or eliminate dependency;

(B) achieving or maintaining self-sufficiency, including reduction or prevention of dependency;

(C) preventing or remedying neglect, abuse, or exploitation of children and adults unable to protect their own interests, or preserving, rehabilitating, or reuniting families;

(D) preventing or reducing inappropriate institutional care by providing for community-based care, home-based care, or other forms of less intensive care; or

(E) securing referral or admission for institutional care when other forms of care are not appropriate, or providing services to individuals in institutions.

42 U.S.C. § 1397a. Each of these goals is addressed by one or more services offered under the Ohio social services program. The services are actually purchased from the county welfare departments or the department which provide them directly or through contracts with independent providers. The welfare department thus defines the permissible or reimbursable services, allocates the federal funds, and monitors Title XX expenditures. As a result of the welfare department's authority under Title XX, plaintiffs allege that it is liable for the conditions which deny Western Reserve patients their constitutional and statutory rights. Specifically, they point to the alleged failure of the welfare department to mandate services which are directed at the above delineated goals, and in particular the goal of community based care. The welfare department has, however, as evidenced by its fiscal year 1978 purchase agreement with the department, specifically contracted for the delivery by the latter of services directed at said goals. (ODPWx P1). Such services include emergency care, intermediate care, outpatient care, psychotherapy, physical and medical care, case management, and transportation. Thus, the Court cannot conclude that the welfare department has failed to adequately address the needs of patients at Western Reserve within the overall framework of Title

XX which seeks to encourage services directed at a number of goals and needy groups.

Finally, each state which participates in the Social Services program must have a plan which

provides, if the State program for the provision of the services described in section 1397a(a)(1) of this title includes services to individuals living in institutions or foster homes, for the establishment or designation of a State authority or authorities which shall be responsible for establishing and maintaining standards for such institutions or homes which are reasonably in accord with recommended standards of national organizations concerned with standards for such institutions or homes, including standards related to admissions policies, safety, sanitation, and protection of civil rights.

42 U.S.C. § 1397b(d)(1)(F). Pursuant to the Purchase of Social Services Contract between the welfare department and the department dated June 30, 1977, the latter is responsible for establishing and maintaining standards for all foster homes and other community facilities where individuals receiving purchased services reside. (ODPWx P1). In pursuance thereof, the division of mental health initially has required community mental health boards to establish and maintain standards in accordance with federal regulations for their subcontract agencies. It has been developing standards in the interim for family care and other types of community residential facilities; at the time of trial such were undergoing final revision prior to formal promulgation. The department has also made inspections of community residential facilities, and has not actively placed patients in facilities which do not meet approved standards or the professional judgment of inspecting staff. Moreover, the aftercare service at Western Reserve has declined to place patients in homes which are substandard in light of their guidelines and those of the welfare department.

In view of the foregoing, the Court cannot find that the department of welfare has failed to fulfill its responsibilities under 42 U.S.C. § 1397b(d)(1)(F). The welfare department has designated the department as the responsible standard setting and maintaining authority, and the latter has acted affirmatively in response thereto.

Therefore, the Court concludes that plaintiffs have not sufficiently established the alleged violations of Title XIX and Title XX by the Ohio Department of Public Welfare. Assuming arguendo that the welfare department has failed to fulfill its statutory obligations thereunder, the court is unable to conclude on the basis of this record that such has so harmed plaintiffs as to require affirmative injunctive relief. Further, upon consideration, the Court hereby finds that the welfare department is not a necessary party in this action, and grants its motion to dismiss.

## CONCLUSION

In this action, the Court has been required to resolve numerous complex factual and legal issues. The Court commends counsel for their cooperation and diligence in this matter.

Upon consideration of the entire record herein, the Court specifically finds as follows:

1. The Court has jurisdiction over this action under 28 U.S.C. § 1343.

2. The defendants, the Governor of Ohio, the director of the Ohio Department of Mental Health and Mental Retardation, the commissioner of the Division of Mental Health, and the superintendent of Western Reserve Psychiatric Habilitation Center, have failed to the extent set forth above to provide minimally adequate treatment to mentally ill persons involuntarily confined at Western Reserve for the purpose of treatment in violation of the Fourteenth Amendment.

3. The defendants have failed to provide mentally ill persons involuntarily confined at Western Reserve for the purpose of treatment ready access to community resources in violation of the Fourteenth Amendment.

4. The defendants have to the extent set forth above denied patients at Western Reserve the treatment required by section 5122.27 of the Ohio Revised Code.

5. The credible evidence has failed to establish the other allegations in plaintiffs' and plaintiff-intervenor's complaints as to the defendants, the director of the Ohio Department of Public Welfare, and the Ohio Rehabilitation Services Commission.

6. The Ohio Rehabilitation Services Commission is a necessary party for relief in this action pursuant to Rule 19, Federal Rules of Civil Procedure.

Accordingly,

IT IS ORDERED that the Governor of Ohio, the director of the Department of Mental Health and Mental Retardation, the commissioner of the Division of Mental Health, and the superintendent of Western Reserve Psychiatric Habilitation Center, and their employees, agents, and anyone acting in concert with them, are hereby permanently enjoined from violating the rights of plaintiffs and the class they represent as guaranteed by the Fourteenth Amendment, and section 5122.27 of the Ohio Revised Code.

IT IS FURTHER ORDERED that the defendants immediately take steps to assure all patients at Western Reserve the treatment required by the law of Ohio.

IT IS FURTHER ORDERED that defendants forthwith thoroughly evaluate all patients at Western Reserve, and formulate and implement an individualized treatment plan for each patient. Said treatment plans shall include each of the assessments and statements required by the preliminary injunction and Executive Order No. MH–5. Further, defendants shall implement and update the individualized treatment plans as required by Executive Order No. MH–5, and Ohio Revised Code § 5122.27(B), (C), and (D).

IT IS FURTHER ORDERED that defendants commence a program of inservice training and continuing education in the design, implementation, and monitoring of meaningful individualized treatment plans.

Said training and continuing education program shall be required for all staff who are members of the unit treatment teams, or are otherwise involved in patient evaluation or the formulation, implementation and monitoring of treatment. Further, defendants shall submit to the Court a plan for compliance with the foregoing directives.

IT IS FURTHER ORDERED that defendants assure that all present and future patients are provided adequate medical treatment for physical injury or disease.

IT IS FURTHER ORDERED that defendants submit a detailed plan for providing mentally ill patients residing in cottage 21 with an adequate physical and psychological environment. The conditions thereof shall meet, at a minimum, the standards set forth in section V of the preliminary injunction, expand the treatment and programing space and render such conducive to therapy, and improve security in those areas· wherein violent patients reside. The plan shall also contain a specific timetable for its implementation. Further, no new patients shall be admitted to units 21 E&F and 21 G&H, the forensic service units housing patients who are behaviorally violent or given to acting out behavior, from outside the other units or cottages until completion of the above described plan or further Order of this Court. Defendants shall not admit to Western Reserve any patients who require initial and/or continuing care and treatment within the secure care units of cottage 21 until defendants provide a humane and therapeutic environment for such individuals.

IT IS FURTHER ORDERED that defendants submit to the Court a report setting forth by appropriate classification the present staff levels at Western Reserve including therein the total number of staff and total patient population. Such report shall also show by classification the number of staff assigned to those units designated for the care and treatment of patients who are suffering an acute condition and those who are behaviorally violent or dangerous, the total number of staff assigned thereto, and the total number of patients residing therein. Further, should the current staffing levels fail to meet the provisions of the preliminary injunction and its amendments in terms of specific staffing requirements, and/or the staff-patient ratios found to be minimally sufficient, defendants shall submit a specific plan for meeting same. Said plan shall state in detail the manner in which defendants shall provide and maintain sufficient staffing and the timetable for compliance with this Order's staffing requirements.

IT IS FURTHER ORDERED that defendants hire and employ only those physicians who meet all licensing and certification requirements of the State of Ohio for persons engaged in the private practice of the same profession.

IT IS FURTHER ORDERED that, in addition to the training and education requirements of the preliminary injunction, defendants give each new staff member a formal, structured orientation program appropriate to that person's position and the needs of the patients. Defendants shall prepare and distribute to each new and current staff member a manual or handbook containing such information as necessary to insure the provision of adequate care and treatment for all patients consistent with this Order, the law of Ohio, and the policies of the Department of Mental Health and Mental Retardation. Further, defendants shall develop and implement a planned program of training and continuing education for all staff with patient contact. Such program must be adequate and appropriate to the staff member's position and the needs of the patients. Also, defendants shall encourage participation in courses and seminars at neighboring universities, and other specially sponsored programs which relate to staff responsibilities and patient needs.

IT IS FURTHER ORDERED that defendants submit to the Court a report setting forth a brief description of all current nonmedical programs and activities for patients at Western Reserve. Said description shall include a statement of the frequency or regularity with which the program or activity actually occurs, the patients for whom such is available, and the average number and category of patients who actually participate therein. In addition, de-

fendants shall submit to the Court a plan for improving the overall level of nonmedical therapeutic programing and regularly scheduled activities.

IT IS FURTHER ORDERED that defendants commence an education program which will teach both new and current staff the skills requisite to the formulation and implementation of therapeutic programs and activities appropriate to the needs and treatment goals of patients.

IT IS FURTHER ORDERED that defendants fully implement the Plan for Cooperative Hospital/RSC Services.

IT IS FURTHER ORDERED that defendants assure ready and regular transportation or access to community resources to all patients for whom such is consistent with their individual treatment plan.

IT IS FURTHER ORDERED that defendants file with the Court and submit to counsel for plaintiffs and plaintiff-intervenor within 90 days of the date of this Order the plans and reports mandated above.

IT IS FURTHER ORDERED that the plaintiffs' and plaintiff-intervenor's complaints are hereby dismissed on the merits with prejudice as to the director of the Ohio Department of Public Welfare.